UNITED STATES of America

v.

Cesar MOYA.

No. 80 CR 341.

United States District Court,
N.D. Illinois, E.D.

May 7, 1981.

Melvyn Kessler, Miami, Fla., for defendant.

Richard N. Cox, Asst. U.S. Atty., Springfield, Ill., for the U.S.

## MEMORANDUM OPINION AND ORDER

DECKER, District Judge.

Defendant Cesar Moya has been charged in a one-count indictment with possession of cocaine with intent to distribute. This constitutes a crime in violation of the provisions of 21 U.S.C. § 841(a)(1). Currently pending is Moya's motion to suppress certain evidence. Since the sole contested questions of fact relate to the motion to suppress, defendant has chosen to waive his right to a jury trial in the event the motion is denied. On the basis of this waiver, the court heard evidence in this case on December 1, 1980. Having carefully reviewed the record and the briefs of the parties, the court hereby enters the following findings of fact and conclusions of law.

On March 20, 1980, Moya was observed deplaning from Delta Airlines Flight 142. Flight 142 was arriving at Chicago's O'Hare Airport from Miami, Florida. The flight was observed by agent Kenneth Labik, of the Drug Enforcement Administration, and officer Thomas Kinsella, of the Chicago Police Department. Labik and Kinsella were observing Flight 142 because they had been informed by their agencies that Miami was a source city for much of the illegal drug traffic into Chicago. There was no direct evidence introduced at trial to substantiate this belief.[1]

After deplaning, Moya walked across the concourse from the arrival gate and surveyed the crowd. He then walked down the concourse towards the main terminal, looking backwards, over his shoulder periodically. During this time Labik and Kinsella were following Moya in order to keep him under observation. Before reaching the main terminal, Moya entered a men's room, followed by Labik. Moya checked all of the enclosed stalls and, discovering that they were all full, left the men's room. Upon reaching the main terminal, Moya again entered a men's room, this time followed by Kinsella. Moya found an open stall, entered it, closed the door, stood there for several minutes, and then left. Moya did not use the toilet. On leaving the men's room, Moya went downstairs to the arrival area of the terminal and entered a cab line. He did not go to the baggage claim area, and his sole piece of luggage was a shoulder bag, which he had carried off of the airplane.

As he was standing in the cab line, Moya was approached by Labik and Kinsella, who promptly identified themselves and asked Moya if they could speak with him. Moya said that they could. Labik and Kinsella testified that at this point they asked Moya for some identification, and that Moya denied that he had any. Moya testified that he was not asked for identification at this point. In any event, Moya was asked if he would agree to move back inside the terminal building in order to avoid the night chill and the pedestrian traffic. Again, Moya agreed. Once inside the building's foyer the questioning resumed. Moya was asked

---

1. When evidence to this effect was first introduced, defendant's attorney objected to it as hearsay. The court overruled the objection, but admitted the testimony for the sole purpose of establishing the agents' motivation in choosing to observe this particular flight. The evidence was not admitted for the purpose of establishing that Miami is in fact a source city for much of the illegal drug traffic into Chicago.

his name, which he gave as Cesar Moya, and he was asked for his airline ticket. He produced the ticket which was a one-way fare on Delta Flight 142 in the name of Cesar Moya. After examining the ticket Labik asked Moya for further identification. Moya responded by asking what this was all about. Labik ignored the inquiry, asking again for identification. Moya testified that at about this point he asked to leave, but that Labik and Kinsella would not let him go. Labik denied this. Kinsella did not testify on the point. After his question about the purpose of the interrogation was ignored, Moya reached into a side pocket of his shoulder bag and produced his driver's license. The driver's license was in Moya's name and had his picture on it. In reaching into the pocket, however, Moya gave Labik a view of a corner of a clear plastic bag. Labik asked Moya to produce the bag. Moya denied that he had a plastic bag. Labik told Moya that, "If he wouldn't remove it [the bag], I would." Moya removed the bag, which proved to contain several other clear bags, some small bottles, and some small spoons. Moya told Labik and Kinsella that he used the contents of the bag to carry jewelry. Persuasive evidence adduced at the trial, however, indicates that the contents of the bag consisted of drug paraphernalia. At this point Labik and Kinsella asked Moya's permission to search the bag, telling him that he had a right to refuse. Moya refused. Labik and Kinsella then detained the bag in order to attempt to obtain a search warrant, and Moya left. Shortly thereafter, a trained police dog picked out Moya's bag from among a group of six others. On the basis of this showing, a search warrant was obtained. The validity of the warrant is not disputed. A search of the bag revealed that Moya had been carrying 501.77 grams of 35% cocaine. This quantity of cocaine has a street value of between $40,000 and $50,000. This is more cocaine than one person would normally hold for his personal use.[2]

The central issue in this case is whether or not the seizure of Moya's bag was constitutionally permissible. If that seizure was permissible, then, as defendant admits, the ultimate search of the bag was proper, and the evidence obtained is admissible. If, however, the seizure was improper, then the evidence obtained from searching the bag is "fruit of the poisonous tree" and, as such, it must be suppressed. *Wong Sun v. U.S.*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Agent Labik testified that he "had no intention or thought of getting a search warrant or seizing that bag" at the time he and Kinsella approached Moya at the cab line. Consequently, the propriety of this seizure turns on two questions: (1) Was Moya "seized" in violation of his Fourth Amendment rights during the period when he was being questioned by Labik and Kinsella. (2) Assuming that the questioning did not amount to an unconstitutional seizure, did anything that came to light during the course of the questioning, when taken in conjunction with Moya's previous behavior, justify seizure of the bag.

*Seizure of Moya's person.*

Moya argues that, if his interview with Labik and Kinsella amounted to a seizure, then it was an improper one. In this Moya is correct. In *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980), the Supreme Court was considering an appeal from the State Supreme Court of Georgia. There, as here, the defendant had been interrogated at an airport by a DEA agent. The agent observed Reid deplaning from a Fort Lauderdale flight. He and another male passenger were carrying identical flight bags. Reid and this other passenger walked down the airport concourse separately, but at the end of the concourse they joined one another and left the building together. During their walk to the main terminal, Reid occasionally looked behind

---

**2.** There are a variety of conflicts in the testimony not discussed above. Thus, for example, Moya asserts that the interview lasted 40 minutes, whereas the agents contend that it lasted only 15. Similarly, there is some dispute over the conditions under which the agents took a photograph of Moya after his bag was seized. For reasons that will become clear, the court does not view any of these disputes as material to the controlling issues in this case.

himself towards the second man. Neither man picked up any additional luggage. As they left the main terminal, Reid and the other man were approached by the DEA agent. Subsequent events resulted in seizure of one of the airline bags which turned out to contain cocaine. The court below had presumed that the questioning of Reid and his colleague by the DEA agent was a seizure. Consequently, the sole question before the Supreme Court was whether or not a seizure could be constitutionally justified on these facts. In a *per curiam* opinion from which only Justice Rehnquist dissented, the Court concluded that the DEA agent did not have sufficient grounds for seizing Reid and his partner.

The Court began its argument by emphasizing that,

"While . . . in some circumstances a person may be detained briefly, without probable cause to arrest him, any curtailment of a person's liberty by the police must be supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity." *Reid v. Georgia,* 100 S.Ct. at 2753.

In *Reid* the only reasons given for the stop of the defendant were the fact that he had deplaned from a flight arriving from a principal place of origin for cocaine distribution, the fact that defendant arrived early in the morning when law enforcement activity is diminished, the fact that he and his companion apparently were attempting to conceal that they were traveling together, and the fact that defendant and his companion had no luggage other than their shoulder bags. These observations, taken together, were said to bring Reid into conformity with the so-called " 'drug courier profile,' a somewhat informal compilation of characteristics believed to be typical of persons unlawfully carrying narcotics," *id.,* and, therefore, to justify the stop. The Court, however, concluded:

" . . . that the agent could not as a matter of law, have reasonably suspected the petitioner of criminal activity on the basis of these observed circumstances. Of the evidence relied on, only the fact that the petitioner preceded another person and occasionally looked backward at him as they proceeded through the concourse relates to their particular conduct. The other circumstances describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure." *Id.,* 100 S.Ct. at 2754.

Here the reasons given by Labik and Kinsella for suspecting Moya prior to the time they approached him at the cab line were no more substantial than the reasons rejected by the Court in *Reid.* At the time they approached him, Labik and Kinsella knew only that Moya had deplaned from a Miami flight,[3] that he was carrying no luggage other than a shoulder bag, that he had repeatedly scanned the crowd and looked back over his shoulder, and that he had sought the privacy of a washroom stall for some reason other than a desire to relieve himself. As it turned out, of course, Labik and Kinsella were correct to find this behavior suspicious. But it would not be difficult to imagine perfectly innocent explanations for every one of Moya's actions. If interrogations based on such suspicions are indeed constitutional seizures, then it is likely that numerous innocent people are routinely "seized" in violation of the Constitution every week. Indeed, Labik himself testified that he routinely approaches two or three people a day on the basis of similar suspicions, but that these stops have led to only 70 or 80 arrests during his three years at O'Hare. Thus, as defendant has pointed out, presuming a 5-day work week and a 50-week work year, stops based on the sort of evidence that led to Moya's questioning result in arrests only 3–5% of the time. In short, there is every reason to believe that Moya's questioning would be constitutionally insupportable if that questioning rose to

---

**3.** As noted above, *supra,* n. 1, at p. 2, there was no evidence introduced at trial that would permit the court to give any weight to the fact that Moya's flight originated in Miami.

the level of a Fourth Amendment "seizure."[4]

▮ Moya, of course, contends that the questioning did trigger the Fourth Amendment's protections. He is mistaken. Not every contact between a law enforcement officer and the public is a matter of constitutional dimensions. Here the undisputed testimony shows that Labik and Kinsella did not engage in any show of force in approaching Moya, that they did not lay hands on him at any time, and that Moya showed no hesitancy in agreeing to respond to their questions or in agreeing to remove himself from the taxi line and enter the terminal foyer. Moreover, Moya himself characterized the officers' tone of voice and attitude as "relaxed" throughout the encounter.[5] While Moya did testify that, at one point, he was barred from leaving, Labik directly and expressly contradicted this testimony. The court finds Labik's account the more credible. On the whole, Labik gave a more precise, detailed narrative of the relevant events. Moreover, his was an account that was largely corroborated by Kinsella's testimony and by the affidavit filed in support of the search warrant that was ultimately issued in this case. Finally, as a law enforcement officer Labik is an experienced and trained observer whose memory can be given particular credence.

Given all of these circumstances, it is apparent that Moya would have been free to walk away from Labik and Kinsella at any time, that a reasonable man in his position would have realized this, and, therefore, that his participation in the questioning was entirely voluntary. Under these circumstances, no constitutionally cognizable seizure can be said to have taken place.

In *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), the Supreme Court was faced with another airport narcotics interrogation. There, as here, DEA agents approached an air traveller whose behavior they considered suspicious in order to ask her a few questions. As was also true in this case, the agents in *Mendenhall* revealed their identities to the defendant without any show of force or any laying on of hands. While the encounter eventually led to a more intensive confrontation, at least initially the agents merely asked Mendenhall for her ticket and some identification.

Writing the lead opinion in the case, Justice Stewart concluded that no constitutional questions were raised by the stop because it was not sufficiently intrusive to constitute a "seizure." Contending that several of the Court's previous opinions had expressly refrained from deciding whether mere questioning of a cooperative citizen

4. Arguably to the contrary is *U.S. v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). There, by a 5–4 vote, the Court found another airport drug stop to be constitutional. Two of the justices approving the stop did so on the grounds that the stop did not amount to a "seizure" within the meaning of the Fourth Amendment. 100 S.Ct. 1873–1880 (per Stewart and Rehnquist). Four of the justices, dissenting, found that the stop amounted to a seizure and that the police lacked adequate grounds to justify their behavior. 100 S.Ct. at 1883–1889 (per White, Brennan, Marshall and Stevens). The remaining three justices declined to reach the question of whether or not a "seizure" had occurred, holding that even if defendant had been seized, the police had adequate grounds for doing so. Since only three of the justices concluded that the facts of *Mendenhall* comprised a constitutionally permissible seizure, this court hesitates to rely on that decision as establishing when constitutionally significant stops are lawful. The opinion in *Reid*, joined in by eight of the justices, seems a surer guide. Additionally, the court notes that the record in the *Mendenhall* case was stronger than the record here. For one thing, the agents in that case testified that Ms. Mendenhall gave the appearance of being extremely nervous. No similar testimony was adduced here. Moreover, the prosecution in that case established a better foundation to indicate why each of the elements of the "drug courier profile" should be regarded as suspicious. *See* 100 S.Ct. at 1882–1883.

5. Along the same lines, it is worth noting that Moya did not feel compelled to comply with all of the agents' requests and that they did not insist that he do so. Thus, for example, Moya testified that he was asked to permit the agents to inspect his boots. He refused to do so, and this refusal was honored. Again, the agents asked Moya's permission to search his shoulder bag. He refused to give them permission and no search occurred until a warrant was subsequently obtained.

invoked Fourth Amendment considerations, the opinion took as its keynote the Court's earlier observation in *Terry v. Ohio:*

> "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority has in some way restrained the liberty of a citizen may we conclude that a seizure has occurred." *Mendenhall,* 100 S.Ct. at 1876, *quoting Terry,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1963).

The opinion went on to emphasize that any other construction of the scope of the Fourth Amendment's protection would extend that provision beyond any rational understanding of its policy basis:

> "We adhere to the view that a person is 'seized' only when by means of physical force or a show of authority, his freedom of movement is restrained. Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards. The purpose of the Fourth Amendment is not to eliminate all contact between police and citizenry, but 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.'" [Citation omitted.] *Mendenhall,* 100 S.Ct. at 1877.

On the basis of this analysis, Justice Stewart enunciated the following test for determining whether or not a seizure has occurred:

> "We conclude that a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.*

Patently, application of this test to the facts of this case indicate that Moya was not "seized" by Labik and Kinsella.

Arguably, however, this court should not view Justice Stewart's opinion as controlling. Only Justice Rehnquist joined in Stewart's opinion, and the three concurring Justices expressly declined to adopt Justice Stewart's analysis of the Fourth Amendment's scope. These Justices did not reach the seizure question, holding, instead, that the officers in the *Mendenhall* case had sufficient grounds to warrant their stop of the defendant even if the constitutional protections were applicable. Writing for these concurring Justices, Justice Powell stated that he was not inclined to address the seizure question because it had not been properly raised below. He noted, however, that the issue was "extremely close." 100 S.Ct. 1880, n. 1.

In addition to the three concurring Justices, there were four dissenters who declined to follow Justice Stewart's reasoning. While they too doubted that the issue was properly before the Court, the dissenters, in an opinion written by Justice White, expressly disapproved Justice Stewart's holding. They argued that:

> "In *Terry* we 'emphatically reject[ed]' the notion that a 'stop' 'is outside the purview of the Fourth Amendment because' ... [it is not a] "seizure" within the meaning of the Constitution.' *Terry v. Ohio,* 392 U.S. at 16 [88 S.Ct. at 1877] ... We concluded that 'the sounder course is to recognize that the Fourth Amendment governs all intrusions by agents of the public upon personal security and to make the scope of the particular intrusion, in light of all the exigencies of the case, a central element in the analysis of reasonableness.' *id.* at 18 n. 15 [88 S.Ct. at 1876]." *Mendenhall,* 100 S.Ct. at 1884.

The dissenters' argument, however, begs the question. While it is undeniable that *Terry* was meant to bring all police "intrusions ... upon personal security" within the Constitution's protections, the issue raised by Justice Stewart is precisely that

of when such an "intrusion" has taken place.

Indeed, as Justice Stewart points out, *Terry* itself expressly left this question open. In that case the police officer involved "had been a policeman for 39 years and a detective for 35 and ... [he] ... had been assigned to patrol this vicinity of downtown Cleveland for shoplifters and pickpockets for 30 years." 392 U.S. at 5, 88 S.Ct. at 1871. While the officer was unable to articulate precisely what it was about the defendants' conduct that first attracted his attention, his continued surveillance of the defendants led him to believe that they were "casing" a store in preparation for a robbery. At this point he concluded that

> "the situation was ripe for direct action ... [and he] ... approached the three men, identified himself as a police officer and asked for their names.... When the men 'mumbled something' in response to his inquiries ... [the officer] ... grabbed petitioner Terry, spun him around so that they were facing the other two, with Terry between ... [the officer] ... and the others, and patted down the outside of his clothing." *Id.,* at 6–7, 88 S.Ct. at 1872.

This "frisk" of Terry eventually led to the arrest and conviction of Terry and one of his companions on charges of possession of a concealed weapon. The case was before the Court on the issue of whether the weapons uncovered by the frisk were admissible evidence. In reviewing this matter, the Court recognized that the threshold question was whether and when a constitutional "seizure" had taken place. Rejecting the rule proposed below—that no seizure occurred until the point at which defendants were actually arrested—the Court had little trouble finding an earlier seizure on the facts before it:

> "In this case there can be no question ... that ... [the police officer] ... 'seized' petitioner and subjected him to a 'search' when he took hold of him and patted down the outer surfaces of his clothing. We must decide whether at that point it was reasonable for ... [the Officer] ... to have interfered with petitioner's per-

sonal security as he did." *Id.,* at 19, 88 S.Ct. at 1878.

The Court, however, appended a footnote to this passage emphasizing what issues it did not intend to reach:

> "We thus decide nothing today concerning the constitutional propriety of an investigative 'seizure' upon less than probable cause for purposes of 'detention' and interrogation. Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons.... We cannot tell with any certainty upon this record whether any such 'seizure' took place here prior to ... [the officer's] ... initiation of physical contact for purposes of searching Terry for weapons, and we may thus assume that up to that point no intrusion upon constitutionally protected rights had occurred." *Id.,* at 19 n. 16, 88 S.Ct. at 1879 n. 16.

■ The point is that the *Terry* decision explicitly recognized that not all contacts between a police officer and a suspect are automatically seizures, and that, in that case, it was an open question as to whether a seizure had taken place at the time when the officer had merely approached Terry and asked him his name. Consequently, to argue, as did the *Mendenhall* dissenters, that, under *Terry,* an individual is constitutionally seized every time he is approached by a police officer whose suspicions have been aroused and who wishes to ask the citizen some questions is to simply misread that opinion. Moreover, as Justice Stewart points out, it is to torture the term "seizure" beyond all recognition. Certainly, so long as the cooperation is truly voluntary, the suspect's liberty cannot be said to be infringed at all. In short, this court views Justice Stewart's reading of the *Terry* decision as more accurate, and more consistent with the language and policies of the Fourth Amendment than the reading advocated by the *Mendenhall* dissenters. As has already been noted, the principles articulated in his opinion dictate that no constitutional seizure of Moya's person occurred in this case.

It is not, however, disputed that Labik and Kinsella detained Moya's flight bag or that this constituted a seizure of Moya's property. Consequently, the question which remains is whether or not this seizure was permissible.

*Seizure of Moya's property.*

In *United States v. Klein,* 626 F.2d 22 (7th Cir.1980), the Seventh Circuit held that defendants' constitutional rights were not violated where their bags were detained for the purpose of obtaining a search warrant, where the bags were detained subsequent to an airport narcotics interrogation, and where, as a result of the interrogation, the DEA agents "had reasonable suspicion to believe that the bags contained contraband." 626 F.2d at 26. The court expressly rejected defendants' contention that a temporary seizure of their luggage was only proper on a showing of probable cause. 626 F.2d at 24–26.

Thus, the issue in this case is whether Labik and Kinsella had a "reasonable suspicion" that Moya's bag contained contraband at the time that they detained it. The court concludes that they did.

█ For the reasons already given, the court does not believe that Labik and Kinsella had sufficiently well supported suspicions regarding Moya to support a seizure of the bag at the time they approached him in the taxi line. The subsequent interview, however, was ample to justify detention of the luggage. The first question addressed to Moya at the time he was standing in the cab line was a request for identification. Moya's contention that he had none was, of course, suspicious in itself. The suspicious nature of this response was underlined when a subsequent request for identification in the building foyer led Moya to produce his driver's license, thus giving lie to his initial statement.

Moya denies that he initially refused to produce his license. However, both Labik and Kinsella testified to the contrary. The reasons given previously by the court for crediting the agents' testimony above that given by Moya are equally applicable here. Additionally, the record suggests a plausible reason why Moya might have hesitated to produce his license. The driver's license was in the same pocket of his travel bag as the drug paraphernalia that emerged at a later point in the questioning. Moya might well have feared that opening that pocket of the bag would permit the agents to view the drug paraphernalia.

In addition to dissembling about his possession of identification, one additional event during the questioning gave Labik and Kinsella reasonable grounds for suspecting that Moya was engaged in a criminal enterprise. When Moya finally reached into the pocket of his travel bag to produce his license, Labik glimpsed a corner of a clear plastic bag. He promptly asked Moya to remove this bag and show it to him. Moya did not simply refuse to comply with this request, rather he insisted that no plastic bag existed. This was a lie and Labik knew that it was the moment it was uttered. Thus, by the time that Moya initially failed to produce the plastic bag, he had given Labik and Kinsella several grounds for suspecting that his travel bag contained contraband: His behavior in walking from the arrival gate to the taxi stand was sufficient to arouse the officers' inchoate suspicions. After they approached Moya and began to question him, these inchoate suspicions had been sharpened by the disclosure that Moya was hesitant to provide them with information about his identity and by the disclosure that Moya was carrying a plastic bag whose contents he wished to keep a secret. While this information taken as a whole may not have amounted to probable cause to believe that the bag contained contraband, it certainly gave Labik and Kinsella "reasonable and articulable" grounds for suspecting that this was the case. Consequently, if the bag had been detained at this point, the propriety of the seizure would have been clear. Unfortunately, several significant events intervened between Moya's attempt to disown the plastic bag and the seizure of the travel bag.

█ After Moya denied having a plastic bag, Labik repeated his request that the

bag be produced and stated that "if he [(Moya)] wouldn't remove it, I [(Labik)] would." It was immediately following this threat that Moya handed over the plastic bag. Thus, production of the drug paraphernalia was not a voluntary act. It is well established that a citizen has a privacy interest, cognizable under the Fourth Amendment, in protecting against searches of his luggage. It is also well established that, absent "exigent" circumstances, this interest can only be overridden by demonstrating to the satisfaction of an authorized judicial officer that probable cause to search the luggage exists. *Arkansas v. Sanders,* 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979); *U.S. v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977). Here, no exigent circumstances were present.[6] Thus, the order compelling Moya to disclose the contents of his shoulder bag amounted to an unconstitutional warrantless search. Because this is the case, and because it is also the case that discovery of the drug paraphernalia was at least partially responsible for Labik's and Kinsella's decision to detain the luggage, it may be that any evidence discovered as a result of that detention is "fruit of the poisonous tree." The court, however, declines to reach this conclusion.

Essentially, this argument for suppressing the contents of Moya's bag turns on the likelihood that Labik and Kinsella may have subjectively been motivated to seize the bag because of unconstitutionally obtained information. However, to require suppression of the evidence on the basis of this subjective causal link where alternative constitutional grounds for the seizure exist would entail expanding the "fruit of the poisonous tree" doctrine beyond its traditional and proper bounds.

**6.** This was not a search incident to an arrest, and there is no indication that the agents feared that the plastic bag contained a dangerous weapon. Additionally, since they had sufficient grounds for detaining the luggage at this point, the agents could not reasonably have feared that the luggage would pass out of their control. While it is arguable that the plastic

"Fruit of the poisonous tree", like other forms of the exclusionary rule, is designed primarily as a prophylactic against police misconduct. The notion is that the police will be deterred from violating citizens' rights in the course of criminal investigations if the principal incentive for such conduct—the expectation that admissible evidence will come to light—is removed. *E.g., Brown v. Illinois,* 422 U.S. 590, 599–600, 95 S.Ct. 2254, 2259–2260, 45 L.Ed.2d 416 (1975). Application of the doctrine, thus, is not intended to vindicate the *rights* of the individual defendant, so much as it is intended to further the social *policies* favoring police restraint and the integrity of judicial proceedings. *Brown, supra.* But any application of the exclusionary rule, by definition, entails suppression of material evidence in a criminal trial; a result which is patently inconsistent with certain other social policies, namely, those favoring the prosecution of crime. As a consequence, in each application of the exclusionary rule,

> "two opposing concerns must be harmonized: on the one hand, the stern enforcement of the criminal law; on the other, protections of that realm of privacy left free by [the] Constitution ..." *Nardone v. U.S.,* 308 U.S. 338, 340, 60 S.Ct. 266, 267, 84 L.Ed. 307 (1939).

This tension is built into all forms of the exclusionary rule, and it is the touchstone regulating the rule's limitations. Thus, the Supreme Court has never treated "fruit of the poisonous tree" as an omnivorous doctrine:

> "We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection has been made

bag was in "plain view" once Moya opened the side pocket, this does not justify a search of the shoulder bag or a seizure of the drug paraphernalia. *See Coolidge v. New Hampshire,* 403 U.S. 443, 468, 91 S.Ct. 2022, 2039, 29 L.Ed.2d 564 (1971) ("Plain view *alone* is never enough to justify a warrantless seizure.").

has come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. U.S.,* 371 U.S. 471, 487–488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). *Quoting,* Maguire, *Evidence of Guilt* 221 (1959). Specifically, the Court has carved out two exceptions to the doctrine. First, it has held that the exclusionary rule is inapplicable where the evidence at issue is not, in reality, "fruit" of an unlawful act, but, instead, has been "come at" from a source "independent" of the unlawful conduct, *Silverthorne Lumber Co. v. U.S.,* 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920); *Costello v. U.S.,* 365 U.S. 265, 278–281, 81 S.Ct. 534, 541–542, 5 L.Ed.2d 551 (1961). Additionally, the Court has recognized that the exclusionary rule is inapplicable where the causal link between the unlawful conduct and the discovery of the disputed evidence has been "so attenuated" by intervening factors "as to dissipate the taint." *Nardone, supra,* 308 U.S. at 341, 60 S.Ct. at 267. *See, Wong Sun, supra,* 371 U.S. at 484–486, 491, 83 S.Ct. at 415–416, 419; *Brown, supra,* 422 U.S. 597–605, 95 S.Ct. at 2258–2262.

This case probably does not fall strictly within either of these exceptions to the fruit-of-the-poisonous-tree doctrine. The discovery of the drug paraphernalia was clearly a prime factor in the officers' decision to detain Moya's luggage. Thus, it can hardly be said that the ultimate discovery of cocaine was "come at" from a source of information wholly independent of the illegal search. Additionally, since the unlawful search was obviously calculated to produce evidence that Moya was carrying contraband; since the decision to detain the bag followed within a matter of minutes after discovery of the drug paraphernalia; and since discovery of the cocaine was a direct result of the decision to detain the luggage, it also cannot be concluded that the causal link between the unlawful search and the discovery of the cocaine was "so attenuated as to dissipate the taint." *See Brown,* 422 U.S. at 603–604, 95 S.Ct. at 2261–2262. Still, this does not mean that the fruit-of-the-poisonous-tree doctrine is properly applicable to these facts.

There is nothing in the Court's opinions to indicate that these limitations on fruit-of-the-poisonous-tree reasoning represent anything more than a common sense recognition of two points beyond which the doctrine's deterrent policies are outweighed by the costs it imposes on effective law enforcement. Indeed, it has always been this balancing process that has controlled the scope of the doctrine and the application of its various limitations. As a result, it would be inaccurate to view the exceptions thus far expressly recognized by the Court as written in stone. Certainly, their formulation was not intended to exclude careful case-by-case evaluation of the doctrine's applicability. Broadly speaking, they seem merely to stand for the principle that law enforcement efforts are to be left in the condition they would have occupied had no unlawful conduct occurred.

Indeed, several circuits have, under appropriate circumstances declined to exclude evidence even though the evidence was come at, at least in part, from an unlawful source and even though the link between the unlawful source and the discovered information was not attenuated. In *U.S. v. DeMarce,* 513 F.2d 755 (8th Cir.1975), for example discovery of a rifle used in the crime was directly facilitated by statements made by the defendants under unlawful conditions. Despite its holding that the statements had to be suppressed, the court concluded that the rifle was admissible because the police had independent information which "would" have led to recovery of the gun in any event. 513 F.2d at 758. Similarly, in *U.S. v. Sor-Lokken,* 557 F.2d 755 (10th Cir.1977), *cert. denied,* 434 U.S. 894, 98 S.Ct. 274, 54 L.Ed.2d 181 (1977), the court approved admission of a rifle where police initially discovered the rifle during the course of an unlawful search. The rifle was eventually seized during a second, this time lawful, search. The court concluded that the rifle was not fruit of the poisonous tree because, prior to their unlawful conduct, the police had independent information as to the rifle's whereabouts. *See also,*

*U.S. v. Edwards,* 602 F.2d 458, 469 n. 12 (1st Cir.1979).

Like these other courts, the Seventh Circuit has taken a flexible attitude towards application of the fruit-of-the-poisonous-tree doctrine. Thus, it has been held that evidence is admissible in this Circuit even though partially obtained as a direct result of unlawful conduct so long as a legitimate source of information would "inevitably" have led to discovery. *U.S. ex rel. Owens v. Twomey,* 508 F.2d 858, 865–866 (7th Cir. 1974). In the same vein is the court's opinion in *U.S. v. Piet,* 498 F.2d 178 (7th Cir. 1974), *cert. denied,* 419 U.S. 1069, 95 S.Ct. 655, 42 L.Ed.2d 664 (1974). There FBI agents had been reliably informed that stolen property was being stored in a warehouse in which one of the defendants had been leasing space. On the basis of this information, the FBI searched the warehouse without a warrant, locating the stolen goods. The FBI then obtained a warrant, returned to the warehouse, and seized the contraband. The Seventh Circuit held that the initial search of the warehouse had been permissible because the agents had been voluntarily admitted by the warehouse foreman. However, the court went on to hold that,

> "Even if the March 23 search had been unlawful, that investigation would not have tainted the March 26 search and seizure of the edgers [the contraband]. Prior to the March 23 search, Johnson [the informant] told FBI agents that Markham [one of the defendants] had told him to deliver the stolen edgers to the Able warehouse. Thus, an independent basis existed to support the agents' suspicion that Markham was storing stolen goods at the Able facility." 498 F.2d at 181.

In this case Labik and Kinsella detained Moya's shoulder bag after unlawfully obtaining information about the bag's contents. Even though the unlawfully obtained information was a motivating factor in the decision to seize the bag, the court concludes, for the reasons summarized above, that Labik and Kinsella had previously accumulated in a lawful manner sufficient knowledge to justify the bag's detention. This finding brings this case squarely within the holding in *Piet* and the other court of appeals decisions cited above.

Moreover, this finding makes an exception to the fruit-of-the-poisonous-tree doctrine proper under the policies that regulate that rule's application. The point of the exclusionary rule is to assure that the police will not have an incentive for violating a citizen's constitutional rights. This concern is satisfied so long as the police are not permitted to put themselves in a better investigatory position than they would have occupied but for the unlawful conduct. In a case such as this one, where the officers making the seizure have properly obtained information sufficient to justify their conduct, suppression of the evidence because the seizure was also prompted by improperly obtained knowledge would leave the police worse off than if no wrongdoing had occurred. Such a rule has substantial deterrent value only if it is assumed that police routinely transgress on constitutional rights even when they have no investigatory reason for doing so. The facts of this case, of course, are adequate to demonstrate that the rush of events may prompt a police officer to engage in such gratuitous wrongdoing. But the court declines to conclude that there is any substantial risk that this is commonplace behavior or that such motiveless conduct would be substantially restrained by application of the doctrine. Certainly, the policies favoring "the stern enforcement of the criminal law," *Nardone,* 308 U.S. at 340, 60 S.Ct. at 267, would militate against suppressing evidence whose seizure could readily have been supported by good, lawful police work. In short, suppression of this evidence would not be consonant with the policies that underlie the fruit-of-the-poisonous-tree doctrine and its various limitations.

Since this policy analysis is well supported by the case law in this circuit, this court cannot but conclude that the temporary seizure of Moya's shoulder bag was not tainted by the unlawful seizure of the drug

paraphernalia. Since the court has already concluded that seizure of the bag was otherwise proper, it follows that defendant's motion to suppress the cocaine which came to light as a result of that seizure must be denied.

Having found that the cocaine Moya was carrying at the time he was questioned by the police is admissible evidence, there is nothing in this record to raise a reasonable doubt as to Moya's guilt. He was apprehended in possession of roughly 500 grams of cocaine. The uncontested evidence was that this amount of cocaine is more than any person would carry for his individual use. Such a showing suffices to support an inference that the defendant intended to distribute the cocaine in his possession. *U.S. v. Muckenthaler,* 584 F.2d 240, 247 (8th Cir.1978). On the basis of all of the evidence before it, this court concludes that such an inference is appropriate in this case.

Accordingly, this court finds the defendant guilty beyond a reasonable doubt of having violated the provisions of 21 U.S.C. § 841(a)(1) as charged in the indictment.