UNITED STATES of America, Appellee,

v.

James A. McKINES, Appellant.

No. 89–2920.

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 1, 1991.

Decided May 17, 1991.

John R. Gibson, Circuit Judge, filed opinion concurring specially, joined by Fagg and Loken, Circuit Judges.

Beam, Circuit Judge, joined by Bowman and Wollman, Circuit Judges, dissented in part.

Magill, Circuit Judge, with whom Lay, Chief Judge, and McMillian and Arnold, Circuit Judges, joined, filed dissenting opinion, and concurring in Part I of Judge Gibson's special concurrence.

Lay, Chief Judge, with whom McMillan, Circuit Judge joined, filed a dissenting opinion.

Elven Bauman, Belton, Mo., for appellant.

Mark Miller, Kansas City, Mo., for appellee.

Before LAY, Chief Judge, McMILLIAN, ARNOLD, JOHN R. GIBSON, FAGG, BOWMAN, WOLLMAN, MAGILL, BEAM and LOKEN, Circuit Judges, En Banc.

BEAM, Circuit Judge, joined by BOWMAN and WOLLMAN, Circuit Judges.

JOHN R. GIBSON, FAGG and LOKEN, Circuit Judges, join in Parts I and IIA and join in those portions of Part IIC indicated in the special concurrence.

James A. McKines appeals from his conviction, following a two-day jury trial, for conspiracy to possess with intent to distribute phencyclidine (PCP), in violation of 21 U.S.C. § 846 (1988); for possession with intent to distribute PCP, in violation of 21 U.S.C. § 841(a)(1) (1988); and for travelling in interstate commerce with the intent to possess PCP, in violation of 18 U.S.C.

§ 1952 (1988). Because of two prior convictions for possession of PCP, the district court sentenced McKines to the mandatory life terms required by the first and second counts. *See* 21 U.S.C. § 841(b)(1)(A). McKines was also sentenced to prison for five years on the remaining count.

McKines argues that the district court erred in denying his motion to suppress evidence seized from his baggage at the Kansas City International Airport, that proof of two prior drug convictions should not have been received in evidence, and that the mandatory life sentences violate the eighth amendment. We affirm.

## I. BACKGROUND

Around seven o'clock in the morning on June 8, 1989, Agent Carl Hicks of the Drug Enforcement Administration watched McKines deplane from flight 656, arriving in Kansas City from Las Vegas. Hicks, joined by two detectives from the Platte County Sheriff's Office, Tully Kessler and Paul Carrill, and working his regular detail at the airport, was looking for drug couriers. All three officers were in plain clothes and did not wear exposed badges or weapons. As he got off the plane, McKines caught Hicks's attention. Hicks noticed that McKines was casually dressed in black corduroy trousers, a white pullover shirt, and either loafers or sandals without socks. He was bearded and wore sunglasses. Hicks watched McKines walk directly to a telephone, apparently make a call, and then proceed to the baggage claim area. There, McKines walked to the back of the carousel, where Hicks observed him glancing about the terminal. McKines claimed two suitcases and left the terminal building in search of a cab.

Based on his observation, Hicks suspected that McKines might be a drug courier and decided to question him. Hicks testified that he approached McKines on the sidewalk outside the terminal, "showed him

my badge and told him that I was a police officer and asked him if I could talk to him." Transcript of Evidentiary Hearing, July 27, 1989, at 6 (July 27, 1989, Hearing Transcript). McKines, whom Hicks described as cool and collected throughout the interview, replied, "Sure." *Id.* at 7. At the agent's request, McKines gave Hicks his airplane ticket, issued to John McKines, and his driver's license, bearing the name James McKines. McKines shrugged off this discrepancy. Hicks returned these items before again showing his badge, identifying himself as an agent with the DEA, and telling McKines that he was watching for drugs being smuggled into Kansas City. *Id.* at 10.[1] McKines readily gave permission for Hicks to search his suitcases.

When McKines began to open one of the suitcases on the crowded sidewalk, Hicks suggested that they move back inside the terminal to a less crowded area. In a small alcove just inside the terminal door, Hicks first examined the smaller suitcase, in which he found only men's clothing. Before Hicks opened the second suitcase, McKines commented that it had been given to him by Charlotte, a friend in Las Vegas, for delivery to her sister, Michelle, in Kansas City. In this suitcase Hicks found, among other things, an eight-pack of sixteen-ounce Mountain Dew bottles. As soon as he opened the suitcase, Hicks thought that he smelled PCP, but he could not pinpoint its source. "I smelled the top of the bottles and I smelled a faint odor of what I felt was PCP but in examining the bottle caps, the bottle caps were still in a sealed condition and appeared not to have been removed or tampered with." *Id.* at 14. Hicks then concluded the interview and McKines resumed his search for a cab.

After McKines left the terminal, detective Kessler, who had moved to within several feet of the suitcases when Hicks examined the Mountain Dew bottles, told Hicks

1. In its footnote 2, Judge Magill's dissent implies that our factual recitation is deficient in an important detail. Agent Hicks's actual testimony was as follows: "At that time I again showed my badge to Mr. McKinis [sic], told him that I was a special agent with the Drug Enforcement Administration and I was watching for drugs being smuggled into the airport." Hearing Transcript at 10. Hicks continued: "I asked him if he had any drugs concealed in his suitcases and he said that he did not." *Id.* at 11.

that he was certain that the liquid in the bottles was not Mountain Dew. Mountain Dew, he explained, is an opaque liquid which discolors the green glass of the bottles, while the liquid in these bottles appeared to be clear. He also observed that he had learned from prison inmates that it was possible to reseal a bottle to make it look as if it had never been opened. Hicks then pursued McKines outside, where he found him already seated in the back seat of a cab. Hicks asked if he could again look in the larger suitcase, and McKines readily consented. When the suitcase was opened, Hicks took a bottle, unsealed it, and immediately detected the very strong odor of PCP. Hicks promptly arrested McKines.

Prior to trial, McKines moved to suppress the evidence seized from the suitcase. Following an evidentiary hearing, the United States Magistrate Judge recommended that the motion be denied. The magistrate found no constitutional violation because the encounter between Hicks and McKines did not implicate the fourth amendment. The magistrate also found that McKines voluntarily consented to the search. The district court adopted the magistrate's report and recommendation and denied the motion to suppress. On appeal, McKines argues primarily that the encounter with Agent Hicks was not supported by reasonable suspicion. We must first consider, however, whether the encounter implicated the fourth amendment.

## II. DISCUSSION

### A. Fourth amendment seizure

■ In *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968), the Supreme Court noted that "not all personal intercourse between policemen and citizens involves 'seizures' of persons." As the Supreme Court readily admits, *see*

*INS v. Delgado*, 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984), and as its cases illustrate, defining this sort of fourth amendment seizure—an intrusion on personal liberty beyond that occurring during an entirely consensual encounter between citizens and police officers, but short of traditional, full-scale arrest requiring probable cause—is difficult. Nevertheless, it is at least clear that such a seizure occurs "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *United States v. Mendenhall*, 446 U.S. 544, 552, 100 S.Ct. 1870, 1876, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.) (quoting *Terry*, 392 U.S. at 19 n. 16, 88 S.Ct. at 1879 n. 16). Justice Stewart's opinion has since been cited and relied on for establishing the test for a fourth amendment seizure: "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* 446 U.S. at 554, 100 S.Ct. at 1877. *Accord Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988); *Delgado*, 466 U.S. at 215, 104 S.Ct. at 1762; *Florida v. Royer*, 460 U.S. 491, 502, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983).[2]

As the Supreme Court's cases make clear, this test requires, generally, that we "take into account 'all of the circumstances surrounding the incident' in each individual case." *Chesternut*, 486 U.S. at 572, 108 S.Ct. at 1978 (quoting *Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877). The Supreme Court has explicitly set forth several factors which might aid in applying the *Mendenhall* test.

> Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers,

**2.** The Supreme Court's recent decision in *California v. Hodari D.,* —— U.S. ——, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), does not affect our discussion of the *Mendenhall* test. In *Hodari D.,* the Supreme Court dealt with a "narrow question" not present in our case—whether a person who does not yield to a show of authority is seized. In considering this question, the Court

did not change its established application of the *Mendenhall* test. Rather, it found, for purposes of the secondary question before it, that *Mendenhall* "states a *necessary,* but not a *sufficient* condition for seizure." *Hodari D.,* —— U.S. ——, 111 S.Ct. at 1551. Because it states a necessary condition for seizure, the *Mendenhall* test must first be satisfied. It is not in this case.

the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

*Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877. Applying the test in *Mendenhall,* Justice Stewart found no fourth amendment seizure.[3] Agents of the DEA stopped Mendenhall in the airport concourse, identified themselves as federal agents, asked to see her identification and her airline ticket, noted discrepancies between the two, and then one agent specifically identified himself as a federal narcotics agent. *Id.* at 547–48, 100 S.Ct. at 1873. The officers asked Mendenhall to accompany them up a flight of stairs to the DEA's airport office, where Mendenhall consented to a search of her person.

Making clear that Mendenhall "was not seized simply by reason of the fact that the agents approached her, asked her if she would show them her ticket and identification, and posed to her a few questions," *id.* at 555, 100 S.Ct. at 1877, Justice Stewart considered it significant that the questioning took place in public, that the agents were in plain clothes and did not display weapons, and that their manner was not in any intentional way coercive or intimidat-

ing. *See id.* In short, Justice Stewart's opinion emphasizes that "a person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained." *Id.* at 553, 100 S.Ct. at 1877.

As if to illustrate the imprecision inherent in the test for a fourth amendment seizure, an almost equally fractured Court found a seizure in a similar airport search case. *See Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).[4] In *Royer,* the Supreme Court affirmed the conclusion of the Florida District Court of Appeal that Royer had been illegally detained and that the search of his luggage was tainted by the illegal detention. Royer was stopped at the airport by state narcotics investigators who identified themselves as police officers, asked to see Royer's plane ticket and driver's license, and then informed him that they were, specifically, narcotics investigators with reason to suspect him of drug trafficking. *Id.* at 493–94, 103 S.Ct. at 1322. The officers then asked Royer to accompany them to a room, which was characterized as a large storage closet, inside of which Royer consented to the search of his luggage. *Id.* at 494–95, 103 S.Ct. at 1322–23. The Supreme Court found a fourth amendment seizure "when the officers identified themselves as narcot-

3. The Supreme Court was divided in *Mendenhall.* Justice Stewart wrote the opinion of the Court, in which only Justice Rehnquist fully joined. Justice Stewart's opinion was also partially joined by Chief Justice Burger and Justices Blackmun and Powell, but these Justices did not necessarily concur in Justice Stewart's conclusion that no fourth amendment seizure occurred. *Mendenhall,* 446 U.S. at 560 n. 1, 100 S.Ct. at 1880 n. 1. (Powell, J., concurring in part and concurring in the judgment). Rather, they concluded, in an opinion by Justice Powell, that, assuming that a fourth amendment seizure occurred, it was supported by reasonable suspicion. Because Justices Stewart and Rehnquist found no seizure, they did not reach the issue of reasonable suspicion. Thus, Justice White wrote in dissent that the Court's conclusion that the agents had acted lawfully was "particularly curious because a majority of the Members of the Court refuse to reject the conclusion that Ms. Mendenhall was 'seized,' while a separate majority decline to hold that there were reasonable grounds to justify a seizure." *Id.* at 566, 100 S.Ct. at 1883 (White, J., dissenting).

Although the opinion of the Court was fully joined by only two members, its significance is untarnished, for the Supreme Court has since cited and relied on it with approval. *See Michigan v. Chesternut,* 486 U.S. 567, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988); *INS v. Delgado,* 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984); *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). In none of these cases does any Justice, concurring or dissenting, reject the *Mendenhall* test. Moreover, the *Mendenhall* illustrative factors have been cited with approval in this circuit. *See, e.g., United States v. Jefferson,* 906 F.2d 346, 349 (8th Cir.1990).

4. Only a plurality in *Royer* concluded that a fourth amendment seizure occurred. Thus, *Royer* and *Mendenhall* dramatize the difficulties inherent in fourth amendment analysis, and the inappropriateness of any facile test for a fourth amendment seizure. *See Chesternut,* 486 U.S. at 572–73, 108 S.Ct. at 1978–79 (rejecting any brightline rule in applying *Mendenhall* test).

ics agents, told Royer that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and without indicating in any way that he was free to depart." *Id.* at 501, 103 S.Ct. at 1326.

*Mendenhall* and *Royer* emphasize the fact-specific aspects of the test those cases adopted and to which the Supreme Court referred in *Chesternut* as "our traditional contextual approach." *Chesternut,* 486 U.S. at 573, 108 S.Ct. at 1979. Thus, the Supreme Court in *Royer* warned against any less particular approach.

> We do not suggest that there is a litmus-paper test for distinguishing a consensual encounter from a seizure or for determining when a seizure exceeds the bounds of an investigative stop. Even in the discrete category of airport encounters, there will be endless variations in the facts and circumstances, so much variation that it is unlikely that the courts can reduce to a sentence or a paragraph a rule that will provide unarguable answers to the question whether there has been an unreasonable search or seizure in violation of the Fourth Amendment.

*Royer,* 460 U.S. at 506–07, 103 S.Ct. at 1329. *Accord United States v. Jefferson,* 906 F.2d 346, 349 (8th Cir.1990); *United States v. $91,960,* 897 F.2d 1457, 1461 (8th Cir.1990); *United States v. Nunley,* 873 F.2d 182, 185 (8th Cir.1989).

In spite of this admonition, several of our recent airportstop cases seem to point toward the adoption of just such a brightline test. *See United States v. Condelee,* 915 F.2d 1206 (8th Cir.1990); *United States v. Millan,* 912 F.2d 1014 (8th Cir.1990); *United States v. Drinkard,* 900 F.2d 140 (8th Cir.1990). Together, these cases can be read to hold that a fourth amendment seizure occurs whenever an officer specifically identifies himself as a drug enforcement officer by flashing his badge a second time, and makes the suspect aware that he is the focus of a drug investigation.

In *Condelee,* for instance, we agreed with the *parties* that a fourth amendment seizure occurred under these circumstances: "The parties agree that the initial consensual encounter between Agent Hicks and Condelee was transformed into a *Terry* stop when Agent Hicks showed Condelee his badge for a second time, told her he was watching for drugs being smuggled into KCI, and asked if she had any drugs." *Condelee,* 915 F.2d at 1209 (citing *Drinkard,* 900 F.2d at 142–43). Similarly, in *Millan,* we reversed the district court's finding of no fourth amendment seizure, holding, without further discussion, "that the consensual encounter turned into a fourth amendment seizure when Hicks showed Millan his badge for the second time and began questioning Millan about drugs." *Millan,* 912 F.2d at 1016 (citing *United States v. Nunley,* 873 F.2d 182 (8th Cir.1989) and *United States v. Sadosky,* 732 F.2d 1388 (8th Cir.), *cert. denied,* 469 U.S. 884, 105 S.Ct. 254, 83 L.Ed.2d 191 (1984)). Following *Drinkard,* in which we also reversed the district court's conclusion that no seizure occurred, in part because Hicks twice identified himself as a drug agent and because he specifically asked Drinkard if he had any drugs, *Drinkard,* 900 F.2d at 142, these cases have been cited as authority for a summary finding by the court of appeals of a fourth amendment seizure based solely on these two factors. *See* Appellant's Petition for Rehearing En Banc at 5 (relying on litmus test adopted by Eighth Circuit).

■ It is this possible analysis that makes these cases cause for concern—not that the facts of flashing a badge and making a suspect aware that he is suspected of drug trafficking are themselves irrelevant in determining the occurrence of a fourth amendment seizure, but that these cases can apparently be read to require a finding of a fourth amendment seizure based on these factors alone. In light of *Mendenhall, Royer, Delgado,* and *Chesternut,* any such conclusion is improper. Thus, insofar as they purport to establish a bright line rule that seizure occurs when an officer identifies himself as a drug enforcement agent and flashes his badge a second time, *Condelee, Drinkard,* and *Millan* con-

flict with *Mendenhall, Royer, Delgado,* and *Chesternut,* and in this respect should not be followed.

Our cases demonstrate that the occurrence of these factors does not predict a seizure. While several of our cases can be cited for the proposition that a fourth amendment seizure occurs when the suspect is made aware that he is the focus of a drug investigation, the contrary is also true. *Compare United States v. White,* 890 F.2d 1413, 1416 (8th Cir.1989), *cert. denied,* ——— U.S. ———, 111 S.Ct. 77, 112 L.Ed.2d 50 (1990); *Nunley,* 873 F.2d at 184–85; *Sadosky,* 732 F.2d at 1392 (finding seizure in part because defendant made aware he was focus of drug investigation) *with United States v. Thompson,* 876 F.2d 1381, 1382 (8th Cir.), *cert. denied,* ——— U.S. ———, 110 S.Ct. 192, 107 L.Ed.2d 147 (1989); *United States v. Hernandez,* 854 F.2d 295, 297 (8th Cir.1988) (finding no seizure even though defendant made aware he was focus of drug investigation).

Similarly, our cases show that we should not attach any independent significance to the fact that an officer displays his badge a second time or in some other way more specifically identifies himself as a drug agent. While we relied on this factor to find a seizure in *Condelee, Millan* and *Drinkard,* we have found no fourth amendment seizure in other cases in which the agents have so specifically identified themselves. *See United States v. Ortega,* 886 F.2d 1062, 1063 (8th Cir.1989); *Hernandez,* 854 F.2d at 297; *United States v. Poitier,* 818 F.2d 679, 682 (8th Cir.1987), *cert. denied,* 484 U.S. 1006, 108 S.Ct. 700, 98 L.Ed.2d 651 (1988). As with notice that the agents are looking for drugs, the fact

that a drug agent identifies himself as such is of no *independent* significance.

This is made even more clear by *Royer* and *Mendenhall,* which reach opposite conclusions about the occurrence of a seizure even though both factors were present in both cases. In *Mendenhall,* as earlier stated, the agents identified themselves twice, first as federal agents, and then specifically as federal narcotics agents. *Mendenhall,* 446 U.S. at 547–48, 100 S.Ct. at 1873–74. According to the Court, no fourth amendment seizure occurred. Indeed, the plurality in *Royer,* in which a fourth amendment seizure did occur, cited *Mendenhall* to conclude that "the fact that the officer identifies himself as a police officer, without more, [would not] convert the encounter into a seizure requiring some level of objective justification." *Royer,* 460 U.S. at 497, 103 S.Ct. at 1324 (citing *Mendenhall,* 446 U.S. at 555, 100 S.Ct. at 1877).

While the Court in *Royer* found a seizure partly because "the officers identified themselves as narcotics agents, [and] told Royer that he was suspected of transporting narcotics," *Royer,* 460 U.S. at 501, 103 S.Ct. at 1326, the Court did not find a seizure on these facts alone. Rather, the Court also relied on the agents' request that Royer follow them to a police room while they retained his identification and plane ticket.[5] If these factors—an officer identifying himself as a federal drug agent, and the officer making defendant aware that he is the focus of a drug investigation—alone constituted a fourth amendment seizure, the Court in *Royer* should have noted that *Mendenhall* was wrongly decided. To the contrary, *Mendenhall* and *Royer* are consistent, as the Court has repeatedly emphasized, because the occurrence of a seizure can be determined only

---

5. The concurring and dissenting opinions in *Royer* support this proposition—that a fourth amendment seizure occurred only when, and because, the officers took Royer to a small room, resembling a closet, while retaining his ticket and identification, and having retrieved his luggage from the airline. *See id.* 460 U.S. at 508–09, 103 S.Ct. at 1329–30 (Powell, J., concurring) (difference between *Mendenhall* and *Royer* found in questioning in the small room, retention of ticket, and possession of luggage); *id.* at

517 n. 2, 103 S.Ct. at 1334 n. 2 (Blackmun, J., dissenting) (same, including that the officers did not advise Royer that he could refuse to be searched). These additional factors, not present in *Mendenhall,* apparently added a "show of authority" which "in some way restrained [Royer's] liberty" sufficient to transform the initially consensual encounter into a fourth amendment seizure. *See Mendenhall,* 446 U.S. at 552, 100 S.Ct. at 1876.

from all the circumstances.[6]

*Mendenhall* and *Royer* make clear, then, that when considering whether police conduct implicates the fourth amendment, we must keep in mind the fact-intensive and imprecise nature of our inquiry. Reference to factors relied on in some other case may be useful, but not determinative. "The test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation." *Chesternut,* 486 U.S. at 573, 108 S.Ct. at 1979. Thus, in *Chesternut,* the Supreme Court rejected the attempts of both petitioner and respondent to "fashion a bright-line rule applicable to all investigatory pursuits," and instead "adhere[d] to our traditional contextual approach." *Id.* at 572–73, 108 S.Ct. at 1978–79. We must inquire, then, whether all the circumstances involved in the officers' questioning of McKines were so intimidating, threatening or coercive that a reasonable person would not have believed himself free to leave. *See Delgado,* 466 U.S. at 216, 104 S.Ct. at 1762. This inquiry, of course, must be undertaken in light of the governing standard of review.

B. Standard of Review [Part B is a dissent on this issue.]

The appropriate standard of review depends in some part on how we characterize the question of the occurrence of a seizure. The Supreme Court itself has "noted the vexing nature of the distinction between questions of fact and questions of law." *Pullman–Standard v. Swint,* 456 U.S. 273, 288, 102 S.Ct. 1781, 1790, 72 L.Ed.2d 66 (1982). *Accord Cooter & Gell v. Hartmarx Corp.,* —— U.S. ——, 110 S.Ct. 2447, 2458–59, 110 L.Ed.2d 359 (1990). Thus, it should not be surprising that in the four Supreme Court cases applying the *Mendenhall* test, the Court makes only isolated references to the character of the seizure question.

For instance, in *Mendenhall,* Justice Stewart, joined only by then-Justice Rehnquist, noted that "the correctness of the legal characterization of the facts appearing in the record is a matter for this Court to determine." *Mendenhall,* 446 U.S. at 551 n. 5, 100 S.Ct. at 1875 n. 5. Similarly, in his concurrence in *Delgado,* Justice Powell wrote that determining whether a reasonable person would think himself free to leave "turns on a difficult characterization of fact and law." *Delgado,* 466 U.S. at 221, 104 S.Ct. at 1765 (Powell, J., concurring in the result). Yet nothing in these cases indicates that a majority of justices have concluded that the issue of seizure vel non is a mixed question of law and fact necessarily subject, as Judge Gibson's concurrence in this case asserts, to de novo review. Indeed, other isolated references suggest that the question is one of fact. *See, e.g., Mendenhall,* 446 U.S. at 569–70, 100 S.Ct. at 1884–85 (White, J., dissenting) (noting that plurality should not have reached the seizure question because it is "a fact-bound question with a totality-of-circumstances assessment that is best left in the first instance to the trial court," and referring to this question as a "seizure finding"); *Royer,* 460 U.S. at 516 n. 1, 103 S.Ct. at 1334 n. 1 (Blackmun, J., dissenting) (referring to Royer's belief whether he was free to leave as a "finding"). Ultimately, however, these references seem too sparse and slender to bear the weight of a court determination of a standard of review. This sort of inquiry is simply not fruitful, for it does not appear that the Supreme Court has decided the question.

Likewise, any attempt to conclude from the ultimate disposition of these cases what standard of review the Supreme Court must have silently applied is fraught with danger. It is true that other circuits have found this sort of analysis persuasive. *See United States v. Montilla,* 928 F.2d 583 (2d Cir.1991); *United States v. Maragh,* 894 F.2d 415, 417 (D.C.Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 214, 112 L.Ed.2d 174 (1990). But we think that it is little more

---

**6.** *See, e.g., Royer,* 460 U.S. at 503 n. 9, 103 S.Ct. at 1327 n. 9 ("Our decision here is consistent with the Court's judgment in *United States v.*

*Mendenhall,* 446 U.S. 544 [100 S.Ct. 1870, 64 L.Ed.2d 497] (1980).").

than speculation. In *Chesternut*, for instance, the Supreme Court reversed the conclusion of the Michigan Court of Appeals that a seizure occurred. It could be argued, simply from this conclusion, that the Supreme Court must have applied a de novo standard. Yet the Michigan Court of Appeals had "reluctantly" affirmed the trial court's finding of seizure only because it found itself bound by a clearly erroneous standard. *See Chesternut*, 486 U.S. at 570, 108 S.Ct. at 1977–78. It seems no more conclusive to us that the Supreme Court applied de novo review than that it found that the lower court's finding was, indeed, clearly erroneous. Moreover, given the Supreme Court's explicit references to the lower court's application of the clearly erroneous standard, the Supreme Court's silence on the standard it applied makes the case all the more ambiguous. If the lower court was incorrect in applying clearly erroneous review, the Supreme Court could have said so. More likely, it seems, the Supreme Court simply did not choose to decide the question in *Chesternut*.

Nor can we turn to our sister circuits for clear guidance on this issue, for the circuits are split. At least three circuits apply the clearly erroneous standard. *See United States v. Rose*, 889 F.2d 1490, 1495 (6th Cir.1989) (district court's finding of no seizure not clearly erroneous); *United States v. Gray*, 883 F.2d 320, 322 (4th Cir.1989) (finding of fourth amendment seizure involves question of fact and cannot be reversed unless clearly erroneous); *United States v. Teslim*, 869 F.2d 316, 321 (7th Cir.1989) (determination of seizure under reasonable person test highly factual; apply clearly erroneous standard.) As indicated, two recent circuit cases have adopted de novo review. *See Montilla*, 928 F.2d 583; *Maragh*, 894 F.2d at 417.

Our own cases are inconsistent or simply unclear. Several of our cases hold that we review this issue under the clearly erroneous standard. *See, e.g., Jefferson*, 906 F.2d at 348 ("[W]e will not reverse a district court's finding that a fourth amendment seizure occurred unless the finding is clearly erroneous."); *United States v. Archer*, 840 F.2d 567, 571 (8th Cir.) ("[W]e apply the clearly erroneous standard to review the district court's determinations, made in the context of a motion to suppress, as to whether a fourth amendment seizure occurred."), *cert. denied*, 488 U.S. 941, 109 S.Ct. 364, 365, 102 L.Ed.2d 354 (1988); *United States v. Hendrix*, 726 F.2d 433, 434 (8th Cir.1984) (district court's finding that no seizure occurred not clearly erroneous). On the other hand, several of our cases can be read to hold that we review de novo the district court's legal characterization of historical facts. *See, e.g., Condelee*, 915 F.2d at 1209 ("We review *de novo* the legal issue of whether Condelee's detention violated the fourth amendment."); *Hernandez*, 854 F.2d at 297 ("[T]he ultimate conclusion of whether the fourth amendment has been violated is subject to *de novo* review."); *United States v. Campbell*, 843 F.2d 1089, 1092 (8th Cir.1988) (same).[7]

Given that the one consistent, dominant theme in each of the Supreme Court's cases applying the *Mendenhall* test is the Court's emphasis on the fact-intensive nature of the inquiry, we think that the district court's determination is essentially one of fact.[8] In determining the facts nec-

---

**7.** A careful reading of these cases reveals that they do not directly support the proposition of de novo review. That is, they hold that the ultimate question of whether the fourth amendment has been violated is subject to de novo review. That is not, however, the same question as whether a seizure occurred; the ultimate conclusion whether the fourth amendment is violated depends in this context on whether a seizure, once found, is supported by reasonable suspicion. *See Maragh*, 894 F.2d at 421 (Mikva, J., dissenting) ("The factual question of whether a seizure has occurred should not be confused with the legal conclusion of whether the seizure was lawful." (citing *United States v. Campbell*, 843 F.2d 1089, 1092 (8th Cir.1988))).

**8.** In *Hodari D.*, the Court stated: "Application of this objective [*Mendenhall*] test was the basis for our decision in … *Chesternut*, where we concluded that the police cruiser's slow following of the defendant did not convey the message that he [Chesternut] was not free to disregard the police and go about his business." *Hodari D.*, —— U.S. at ——, 111 S.Ct. at 1552 (citation omitted). From this, it is obvious that a trial court, within the framework of the *Mendenhall* test, must make a determination as to the char-

essary to support a finding of seizure, the district court will consider all the circumstances, generally by conducting an evidentiary hearing at which it must resolve conflicts in testimony and determine the credibility of witnesses. *See Maragh,* 894 F.2d at 422 (Mikva, J., dissenting). The district court is clearly in the best position to determine, for example, whether the presence of several officers is threatening or the officer's use of language or tone of voice compels compliance. *See Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877. The arguably non-factual aspect of the inquiry comes from the objective standard encompassed by the *Mendenhall* test—whether a reasonable person in defendant's position would feel free to leave. Because of this standard it might be said that the court first finds facts and then draws a legal conclusion from them. Judge Gibson's concurrence would contend that this objective standard transforms the inquiry into a legal one, thereby overriding its otherwise fact-intensive nature. To the contrary, we think that the *Mendenhall* test is much like a finding of negligence, which, the Supreme Court has held, is subject to clearly erroneous review. *McAllister v. United States,* 348 U.S. 19, 20, 75 S.Ct. 6, 7–8, 99 L.Ed. 20 (1954); *Cooter & Gell,* 110 S.Ct. at 2459.

As with negligence, the ultimate characterization of the seizure issue as a mixed question or a question of fact is likely not decisive, for the Supreme Court has held that in some cases involving mixed questions the appropriate standard of review depends on the relative positions of the judicial actors.

> We recently observed, with regard to the problem of determining whether mixed questions of law and fact are to be treated as questions of law or of fact for purposes of appellate review, that sometimes the decision "has turned on a determination that, as a matter of the sound administration of justice, one judicial actor is better positioned than another to decide the issue in question."

*Pierce v. Underwood,* 487 U.S. 552, 559–60, 108 S.Ct. 2541, 2547, 101 L.Ed.2d 490 (1988) (quoting *Miller v. Fenton,* 474 U.S. 104, 114, 106 S.Ct. 445, 451–52, 88 L.Ed.2d 405 (1985)). In *Salve Regina College v. Russell,* — U.S. ——, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991), as well, the Supreme Court noted that its articulations of a standard of review "reflect an accommodation of the respective institutional advantages of trial and appellate courts." *Id.* 111 S.Ct. at 1222. Thus, "we have held that deferential review of mixed questions of law and fact is warranted when it appears that the district court is 'better positioned' than the appellate court to decide the issue in question or that probing appellate scrutiny will not contribute to the clarity of legal doctrine." *Id.* (quoting *Miller v. Fenton,* 474 U.S. at 114, 106 S.Ct. at 451–52).

Similarly, in *Cooter & Gell,* the Supreme Court held that the appropriate standard of appellate review for all issues raised by a Rule 11 violation is the abuse of discretion standard. In arriving at this standard, which the Court noted is in practice indistinguishable from the clearly erroneous standard, *Cooter & Gell,* 110 S.Ct. at 2458, Justice O'Connor emphasized that Rule 11 "requires a court to consider issues rooted in factual determinations." *Id.* at 2459. In determining whether an attorney's conduct was reasonable, "a court must consider all the circumstances of a case," including credibility matters. *Id.* Consistent with its other cases, the Supreme Court's choice of a standard of review derived from the relative positions of the district and appellate courts. "Familiar with the issues and litigants, the district court is better situated than the court of appeals to marshal the pertinent facts and apply the fact-dependent legal standard." *Id.* Significantly, that legal standard imposes an objective standard of reasonableness under the circumstances. *See Business Guides v. Chromatic Communications Enters.,* — U.S. ——, 111 S.Ct. 922, 933, 112 L.Ed.2d 1140 (1991).

acter and extent of the message conveyed under the particular circumstances at hand, reviewed

on appeal as outlined in *Cooter & Gell,* 110 S.Ct. at 2459.

As in these cases, we think that the district court is in the best position to determine whether a seizure occurred. As Justice White indicated in his dissent in *Mendenhall,* the seizure inquiry "addresses a fact-bound question with a totality-of-circumstances assessment that is best left in the first instance to the trial court." 446 U.S. at 569, 100 S.Ct. at 1884 (White, J., dissenting). As with the mixed question in *Cooter & Gell,* that the seizure inquiry involves a reasonableness aspect does not deny that the district court is better situated to apply the fact-dependent legal standard.

Thus, we are left to consider whether reason supports de novo review. The only one given is a supposed need for consistent application of the reasonable person test. As Justice O'Connor noted in *Cooter & Gell,* however, "some variation in the application of a standard based on reasonableness is inevitable. 'Fact-bound resolutions cannot be made uniform through appellate review, de novo or otherwise.'" *Cooter & Gell,* 110 S.Ct. at 2460 (quoting *Mars Steel Corp. v. Continental Bank,* 880 F.2d 928, 936 (7th Cir.1989). It is no argument to contend that clearly erroneous review will lead to precisely the sort of application the Supreme Court says is inherent in the *Mendenhall* test. "[W]hat constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs." *Chesternut,* 486 U.S. at 573, 108 S.Ct. at 1979.

Finally, it seems to us, de novo review is fundamentally at odds with that which we seek to preclude in this case: the adoption of a bright-line test. Judge Magill's call for consistent application of the fourth amendment is little more than a call for a bright-line litmus test—explicitly rejected by a unanimous Supreme Court. *See Chesternut,* 486 U.S. at 572–73, 108 S.Ct. at 1978–79. Because it causes the appellate court to "attach talismanic legal significance to those factual details which have recurred" in some cases and thereby apply them to other, similar cases, de novo review will incrementally, but inevitably, lead

to the point at which we embarked in this case. *See Maragh,* 894 F.2d at 420 (Mikva, J., dissenting). Indeed, when Judge Magill's dissent criticizes our rejection of the bright-line test adopted by this circuit because our rejection "fails to recognize the development of the case law," *post* at 1429, it proves our case. For these reasons, we would hold that the district court's determination whether a seizure occurred is subject to clearly erroneous review.

## C. As applied

 On the facts of this case, we cannot say that the district court was clearly erroneous in finding that no seizure occurred. The officers were dressed in plain clothes and did not display weapons in any manner, let alone in a threatening manner. Hearing Transcript at 6. The record reveals no actual physical restraint or touching of McKines. Nor did the officers crowd about McKines in a threatening way. Agent Hicks alone made the initial approach to McKines, as was standard practice, while Detectives Kessler and Carrill stood ten to fifteen feet away. They did not, according to Hicks, in any way block the pathway of McKines. *Id.* at 15. Kessler said that during the interview he stood across a doorway from Hicks and McKines, who were on the sidewalk outside the terminal, about six to eight feet away. Trial Transcript vol. 2, at 30. Kessler was at least far enough away that, while he could hear Hicks and McKines speaking, their conversation was unintelligible. *Id.* at 33. And while Kessler moved to within several feet of McKines when Hicks pulled the Mountain Dew bottle from the suitcase, *id.* at 30, the record nowhere reflects that McKines was even aware of the other officers let alone that he found their presence threatening. In addition, Hicks apparently did not speak to McKines in a coercive or threatening way. Finally, at the evidentiary hearing, the court asked Hicks whether he had, at any time, restrained McKines's freedom of movement.

Q: [D]id you impede the defendant's progress at any time?

A: No, Your Honor.

Q: You approached him—your initial approach was from the side and not in front of him?

A: That's correct.

Q: And you didn't flag down the taxicab to make the second search? It had not moved?

A: It had not moved.

Transcript of Evidentiary Hearing, Aug. 9, 1989, at 27–28. Simply put, "all of the circumstances surrounding the incident," *Chesternut*, 486 U.S. at 572, 108 S.Ct. at 1979, do not reveal that "the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Mendenhall*, 446 U.S. at 552, 100 S.Ct. at 1876. "[T]he circumstances of the encounter [were not] so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded." *Delgado*, 466 U.S. at 216, 104 S.Ct. at 1763.

■ While the interview of McKines presents no fourth amendment concerns, we must still consider whether the search of his luggage without a warrant was constitutionally permissible. It was, of course, if the government can prove that McKines voluntarily consented. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973). Whether consent is voluntarily given is also a "question of fact to be determined from the totality of all the circumstances." *Id.* at 227, 93 S.Ct. at 2048. The district court found that McKines voluntarily consented to the search of his luggage. Given that the encounter between McKines and Hicks did not implicate the fourth amendment, "it cannot be contended that [McKines's] apparent consent to the subsequent search was infected by an unlawful detention." *Mendenhall*, 446 U.S. at 558, 100 S.Ct. at 1879. Nor was the consent otherwise invalid. McKines testified that he knew he could have refused to allow the search. Trial Transcript vol. 2, at 90. "Although the Constitution does not require 'proof of knowledge of a right to refuse as the *sine qua non* of an effective consent to a search,' such knowledge [is] highly relevant to the determination." *Mendenhall*,

446 U.S. at 558–59, 100 S.Ct. at 1879 (citation omitted). Given this fact, the non-threatening circumstances of the interview, and the cool, composed manner in which McKines consented, *see, e.g.,* July 27, 1989, hearing transcript at 27, the district court's finding that McKines voluntarily consented to the search is not clearly erroneous.

■ Alternatively, McKines argues that if he consented to the search of his luggage, he did not consent to the search of the bottles containing PCP. A consensual search may not exceed the scope of the consent given. *United States v. Chaidez*, 906 F.2d 377, 382 (8th Cir.1990); *United States v. Ware*, 890 F.2d 1008, 1011 (8th Cir.1989). We think that McKines's consent to search his luggage included consent to search containers within. In *United States v. Battista*, 876 F.2d 201 (D.C.Cir. 1989), the District of Columbia Circuit upheld the search of plastic-wrapped packages found inside Battista's suitcase, which suitcase the officers had obtained Battista's consent to search.

In effect, Battista would turn the search of this bag into a game of "Mother–may–I," in which [the officer] would have to ask for new permission to remove each article from the suitcase to see what lay underneath. We decline to impose such an unrealistic restriction on an officer's ability to make a search that is reasonably targeted, within the confines of his authority—here, consent to search the suitcase—to uncover the object of the search. Early on in the encounter, Battista was informed that he was suspected of carrying illegal drugs. When he voluntarily opened his suitcase and consented to its search, he did not authorize a search in the abstract. Rather, he authorized a search *for drugs*. [The officer] was therefore justified in probing the contents of the suitcase, within reasonable limits, as was necessary to uncover this particular contraband.

*Id.* at 207–08. *See also United States v. Smith*, 901 F.2d 1116, 1118 (D.C.Cir.) (same), *cert. denied,* —— U.S. ——, 111 S.Ct. 172, 112 L.Ed.2d 136 (1990); *United States v. Dyer*, 784 F.2d 812, 816 (7th Cir.

1986) ("The consent to search luggage validates the search both of the luggage and of containers within the luggage."); 3 W. LaFave, *Search & Seizure* § 8.1(c) at 161 (2d ed. 1987) (general consent permits opening of closed but unlocked containers found in place to which consent given). *Cf. United States v. Anderson*, 859 F.2d 1171, 1176 (3d Cir.1988) (consent-to-search form giving general consent to search trunk of car included consent to search closed bags in trunk).

We agree with this concept. When McKines readily consented to the search of his luggage, as the district court found, he authorized a search for drugs which could be located within any containers in his suitcase. *See Chaidez*, 906 F.2d at 383 (ready consent and failure to object during search relevant to scope of consent given). We cannot say, therefore, that the district court clearly erred in concluding that the search of McKines's luggage did not exceed the scope of his consent. *See id.; Ware*, 890 F.2d at 1011.

## III. CONCLUSION

Airport-stop drug cases involve difficult factual questions with which district courts often struggle at suppression hearings. Their conclusions should not be overturned on the basis of a few factors, drawn not from Supreme Court jurisprudence but from a few circuit cases, and reduced to a sentence or a paragraph, which masquerade as a "rule that will provide unarguable answers." *Royer*, 460 U.S. at 506–07, 103 S.Ct. at 1329. Rather, we must take care to heed the Supreme Court's "clear direction that any assessment as to whether police conduct amounts to a seizure implicating the Fourth Amendment must take into account ' "all of the circumstances surrounding the incident" ' in each individual case." *Chesternut*, 486 U.S. at 572, 108 S.Ct. at 1979 (quoting *Delgado*, 466 U.S. at 215, 104 S.Ct. at 1762). We reaffirm this contextual approach, undertaken in light of the illustrative factors set forth by the Supreme Court.

We have considered McKines's other arguments on appeal and find them to be without merit. The judgment of the district court is affirmed.

JOHN R. GIBSON, Circuit Judge, concurring specially, joined by FAGG and LOKEN, Circuit Judges.

LAY, Chief Judge, McMILLIAN, ARNOLD and MAGILL, Circuit Judges, join in Part I only, which is the opinion of the court as to this issue.

I concur in the court's judgment and concur in Parts I and IIA of its opinion, but write separately as I believe that the issue of whether a seizure occurred is a question of law to be determined de novo. Thus, I do not join in Part IIB of the opinion. Applying the de novo standard, I conclude that no seizure occurred, and I am satisfied that the factual discussion in Part IIC of the court's opinion concerning the encounter between McKines and the officers supports this conclusion. I also agree with the court that consent is a factual issue and that the district court did not clearly err in finding that McKines consented to the search. In this respect, I concur in Part IIC of the opinion.

### I.

■ Although the Supreme Court has not stated that the issue of whether a seizure occurred is a question of law to be reviewed de novo, its approach and analysis demonstrate that it has applied the de novo standard. *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), and *Michigan v. Chesternut*, 486 U.S. 567, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988), all demonstrate that the Supreme Court, in performing a contextual analysis of all of the circumstances surrounding a given incident, reached a legal characterization of the facts before it. Justice Stewart's opinion in *Mendenhall*, joined by then-Justice Rehnquist, supports this conclusion. In addressing whether a seizure had occurred, Justice Stewart acknowledged that the trial and appellate courts had characterized the incident as an investigatory stop. He then stated: "But the correctness of the legal

characterization of the facts appearing in the record *is a matter for this Court to determine.*" 446 U.S. at 551 n. 5, 100 S.Ct. at 1875 n. 5 (emphasis added). *Mendenhall* concluded that the question of seizure required a determination as to whether "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* at 554, 100 S.Ct. at 1877. The Court identified some circumstances that might indicate a seizure, including: "the threatening presence of several officers," a display of force, physical touching, or language "indicating that compliance with the officer's request might be compelled." *Id.* Without such circumstances, there could be no seizure as a matter of law. The Court explained: "In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, *as a matter of law,* amount to a seizure of that person." *Id.* at 555, 100 S.Ct. at 1877 (emphasis added).

*Royer* and *Chesternut* also demonstrate that the Supreme Court approached the seizure issue as a question of law. There is no indication in these cases that the Court reviewed the circumstances under the clearly erroneous standard or granted any deference to the lower courts' determinations. *See Chesternut,* 486 U.S. at 574–76, 108 S.Ct. at 1979–81; *Royer,* 460 U.S. at 501–07, 103 S.Ct. at 1326–29. While not determinative, it is also significant that the Supreme Court in these cases frequently used the words "conclude" or "conclusion," which indicates a determination of a legal issue rather than a review of a factual issue. *See Chesternut,* 486 U.S. at 572, 574, 576, 108 S.Ct. at 1978, 1980, 1981; *Mendenhall,* 446 U.S. at 554, 555, 559, 100 S.Ct. at 1877, 1877, 1879.

The Supreme Court recently analyzed whether a young man who fled upon seeing police officers drive by was "seized" during the subsequent pursuit by one of the officers. *California v. Hodari D.,* —— U.S. ——, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). The Court fully discussed *Mendenhall, Royer,* and *Chesternut* and expressly stated that *Chesternut* adopted the *Mendenhall* test. *Id.* at ——, 111 S.Ct. at 1551–52. In analyzing the factual circumstances surrounding the pursuit, the Court approached the issue of seizure as one of law. The Court expressed no deference to factual findings of the California court, and did not refer to the clearly erroneous rule. *See id.* at —— – ——, 111 S.Ct. at 1549–53. Although the Supreme Court again did not state in so many words what standard it was applying to the seizure issue, it clearly engaged in de novo review of the lower courts' conclusions.

In contrast, the Supreme Court has explicitly stated that the voluntariness of a person's consent to a search, which involves that person's subjective understanding, is a question of fact to be reviewed under the clearly erroneous standard. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 248–49, 93 S.Ct. 2041, 2058–59, 36 L.Ed.2d 854 (1973).

Several circuits have considered the standard of review on the issue of seizure, but only two, the District of Columbia and Second Circuits, engaged in significant analysis. Those two circuits concluded that the issue of whether a seizure occurred is a question of law to be reviewed de novo. *United States v. Maragh,* 894 F.2d 415, 417–18 (D.C.Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 214, 112 L.Ed.2d 174 (1990); *United States v. Montilla,* 928 F.2d 583, 588 (2d Cir.1991). The *Maragh* court reasoned that the *Mendenhall* seizure test, which rests on a determination of whether a reasonable person would have felt free to leave, is an "objective legal test." 894 F.2d at 417. It stressed the language in *Chesternut* stating that the *Mendenhall* test calls for consistent application from one police encounter to the next, regardless of a particular individual's response to the actions of the police. *Id.* at 417–18 (citing *Chesternut,* 486 U.S. at 574, 108 S.Ct. at 1980). De novo review "helps to ensure 'consistent application.'" *Maragh,* 894 F.2d at 418.

In *Montilla,* the Second Circuit dissected the issue a little more finely, holding that the findings as to what the various parties to the encounter said or did are subject to the clearly erroneous standard, but that

whether those statements and acts resulted in a seizure is a question of law subject to de novo review. 928 F.2d at 588. *Montilla* observed that the reasonable person test is an objective standard and "[s]uch an objective inquiry pointedly eschews consideration of intent and involves an essentially legal assessment of whether the particular circumstances would warrant the belief that a person has been detained." *Id.* at 588. *Montilla* also observed that in *Royer* and *Chesternut,* the Court gave no deference to the trier of fact. *Id.* at 588.

We have held as a matter of stare decisis and without extended analysis that the question of whether a seizure occurred is reviewed under the clearly erroneous standard. *See United States v. Archer,* 840 F.2d 567, 571 (8th Cir.), *cert. denied,* 488 U.S. 941, 109 S.Ct. 364, 365, 102 L.Ed.2d 354 (1988). After observing in *United States v. Poitier,* 818 F.2d 679 (8th Cir. 1987), *cert. denied,* 484 U.S. 1006, 108 S.Ct. 700, 98 L.Ed.2d 651 (1988), that the clearly erroneous standard applies to the review of whether particular circumstances justified a warrantless arrest, we concluded that the same standard applies to the issue of whether a seizure occurred. *Id.* at 682. However, after invoking the clearly erroneous standard, we conducted an essentially de novo review in both *Archer* and *Poitier.* Several circuit decisions, *United States v. Gray,* 883 F.2d 320, 322 (4th Cir.1989); *United States v. Rose,* 889 F.2d 1490, 1495 (6th Cir.1989); and *United States v. Teslim,* 869 F.2d 316, 321 (7th Cir.1989), have held that whether a seizure occurred is a factual question to be reviewed under the clearly erroneous standard, but these cases engaged in no detailed analysis of the issue. Only one appellate opinion, Judge Mikva's dissent in *Maragh,* contains analysis supporting application of the clearly erroneous standard. Judge Mikva asserts that the *Mendenhall* reasonable person test, which takes into account all of the surrounding circumstances, is essentially a factual inquiry. 894 F.2d at 420–25 (Mikva, J., dissenting).

We believe that the reasoning in *Maragh* and *Montilla* is compelling and it accords with our reading of *Mendenhall, Royer,* *Chesternut,* and *Hodari D.* We hold, as does *Montilla,* that the findings of the district court as to what the various parties said or did are subject to the clearly erroneous standard. The question of seizure, however, which rests on a reasonable person's belief about the surrounding circumstances, is a legal characterization that must be reviewed de novo. Insofar as our earlier cases may be to the contrary, they should not be followed.

## II.

■ No real dispute exists as to the facts surrounding the circumstances of the initial stop and the events at the airport, and McKines does not argue that any of the background facts outlined in the Magistrate's report and adopted by the district court are clearly erroneous. I have no hesitation in concluding that the factual findings concerning the interview, the searches of the bag, and the opening of the bottle of Mountain Dew, which were found to be consensual, are not clearly erroneous. Applying the *Mendenhall* test for seizure, I can only conclude that no seizure occurred and that McKines' consent to the search was not therefore the product of an illegal detention. The facts as outlined in Part IIC of the court's opinion provide a sufficient foundation for my conclusion. The Supreme Court's recent decision in *Hodari D.* lends further support, as the Court found that no seizure had occurred during the officer's close pursuit of the fleeing youth. If *Hodari D.* was not seized, then I fail to see how a reasonable person could believe, given the circumstances presented by this case, that McKines was not free to leave and thus was seized.

As the interview and search were consensual and no seizure occurred, it is not necessary to reach the question of whether the officers had a reasonable, articulable suspicion. *See Chesternut,* 486 U.S. at 572, 576, 108 S.Ct. at 1978, 1981.

I would affirm the judgment of the district court.

MAGILL, Circuit Judge, dissenting, and concurring in Part I of Judge Gibson's special concurrence, with whom LAY, Chief Judge, McMILLIAN and ARNOLD, Circuit Judges, join.

The majority departs from this court's established fourth amendment jurisprudence by redefining the Supreme Court's contextual approach used in seizure determinations. Because this action lessens the protection afforded by the fourth amendment and reduces the predictability necessary for meaningful and consistent application of the fourth amendment, I respectfully dissent, but concur in Judge Gibson's special concurrence, Part I.

## I.

The majority believes that Agent Hicks' confrontation of McKines and the subsequent luggage search never escalated from a consensual encounter to a *Terry* stop. This belief runs counter to both common sense, *see* Note, *Airport Drug Searches: Giving Content to the Concept of Free and Voluntary Consent,* 77 Va.L.Rev. 183, 202–08 (1991), and to the established case law in this circuit. *See United States v. Condelee,* 915 F.2d 1206 (8th Cir.1990); *United States v. Millan,* 912 F.2d 1014 (8th Cir.1990); *United States v. Drinkard,* 900 F.2d 140 (8th Cir.1990). Because Agent Hicks did not have the requisite reasonable suspicion to make this *Terry* stop constitutional, this encounter violated McKines' fourth amendment rights. Furthermore, since there are no significant attenuating factors separating the fourth amendment violation and McKines' subsequent consent to search his luggage, the consent is invalid and the evidence from this search must be suppressed as fruit of the poisonous tree.

As the majority correctly states, a consensual police encounter is transformed into a limited *Terry*-type investigative detention when an officer, "by means of physical force or *show of authority,* has in some way restrained the liberty of a citizen." *United States v. Mendenhall,* 446 U.S. 544, 552, 100 S.Ct. 1870, 1876, (emphasis added). The *Mendenhall* Court then refined the analysis by adopting a contextual approach, stating that "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* at 554, 100 S.Ct. at 1877. The Court provided a nonexhaustive list of considerations for this analysis, including: "the threatening presence of several officers, the display of a weapon by an officer ... or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.*

In *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion), the Court applied this contextual approach to another airport seizure case, concluding that a fourth amendment seizure had occurred. The majority claims that the inconsistency of the holdings in *Mendenhall* and *Royer* illustrates the imprecision inherent in the Supreme Court's contextual approach. I disagree. I do not think that the two cases are inconsistent, nor the test inherently imprecise. In *Mendenhall,* the police returned the defendant's identification and ticket after asking about the different names that appeared on them. The police then asked the defendant to accompany them to the airport DEA office. While the police did identify themselves as federal narcotics agents, they did not tell the defendant that they suspected her of trafficking drugs. Instead, they merely asked if she would accompany them to the DEA office. *Mendenhall,* 446 U.S. at 548, 100 S.Ct. at 1874. The district court found that the defendant went to the office voluntarily. *Id.* at 557, 100 S.Ct. at 1879. When the defendant arrived at the office, she was repeatedly informed of her right to refuse to consent to being searched. The defendant explicitly refused to exercise this right. While police are not required to inform individuals of their right to refuse to consent to a search, such statements might indicate whether a defendant feels free to leave. In *Royer,* the police did not return the defendant's identification and ticket, nor did they inform him of his right to refuse to consent to being searched. Unlike in *Mendenhall,* the officers in

*Royer* explicitly informed the defendant that they suspected him of transporting narcotics when they reidentified themselves as federal narcotics officers. Furthermore, the officers retrieved the defendant's luggage without his consent and brought it to the room where he was questioned. *Id.* 460 U.S. at 494, 103 S.Ct. at 1322. While there are some similarities between the two situations, the circumstances surrounding the police encounter in *Royer* are clearly more oppressive than those in *Mendenhall* and therefore the cases are not inconsistent.

Applying the contextual approach, the Eighth Circuit has held that fourth amendment issues are raised when the suspect is led to believe she is the particular focus of a narcotics investigation and therefore is not free to leave. *See United States v. Nunley*, 873 F.2d 182, 184–85 (8th Cir. 1989). In *United States v. Drinkard*, the police encounter became a *Terry*-type detention when a DEA agent identified himself twice as a police officer, stated that he was attempting to stop the drug trade entering through the airport, asked whether the defendant had any drugs, and requested permission to search the defendant's luggage.[1] *United States v. Drinkard*, 900 F.2d at 142. After reviewing these facts, the court stated that a "reasonable person in the defendant's circumstances would not have believed that he or she was free to go." *Id.*

The scenario in *McKines* is almost exactly the same as that in *Drinkard*. Initially, Agent Hicks' encounter with McKines was consensual. When Agent Hicks told McKines that he suspected McKines of carrying drugs,[2] that he was a DEA officer who was watching for drug smugglers, and that he wanted to search McKines' baggage, there is little question that a reasonable person would have felt that he was the particular focus of a narcotics investigation. At this point, the consensual encounter was transformed into a *Terry*-type detention.

A limited investigative detention of this sort is permissible if it is supported by a reasonable and articulable suspicion of ongoing criminal activity. *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968). It is significant to note that the government did not even attempt to argue in its brief or at oral argument that Agent Hicks had a reasonable and articulable suspicion of ongoing criminal activity.[3] Therefore, since Agent Hicks did not have a reasonable articulable suspicion, the *Terry* stop constituted an illegal seizure of McKines in violation of the fourth amendment. *See United States v. White*, 890 F.2d 1413, 1417 (8th Cir.1989) (no reasonable, articulable suspicion when officers relied on: suspect's arrival early in the morning from a source city; two prior narcotics-related arrests from the same flight; suspect's nervousness; and suspect having only carry-on luggage).

The majority implies that the Eighth Circuit case law is inconsistent in its approach to airport searches because some cases hold that DEA agents' actions similar to those here constituted a *Terry* stop, while other cases hold that such actions do not raise any fourth amendment questions. *Compare Condelee*, 915 F.2d 1206, 1209 *and Millan*, 912 F.2d 1014, 1016–17 *and Drinkard*, 900 F.2d 140, 142–43 *with Unit-*

---

**1.** The exact position of the three additional plainclothes officers is not clear from the *Drinkard* opinion. It states that the other officers surrounded the defendant, standing 5 to 20 feet away from him. When the cocaine was discovered, it is clear that the officers were close enough to see and comment on the discovery. However, since they were not in uniform and since the DEA agent approached the defendant by himself, it is not clear whether the defendant "felt" their presence for the initial part of the encounter.

**2.** That Agent Hicks told McKines that he suspected McKines of transporting illegal narcotics

is disturbingly absent from the majority's rendition of the facts.

**3.** The majority fails to point out this very significant fact. Instead, it obscures the issue by stating: "Based on his observation, Hicks suspected that McKines might be a drug courier and decided to question him." Op. at 1414. While the government implicitly acknowledged that McKines' casual attire and early arrival did not give rise to a reasonable articulable suspicion, the majority seems to imply that Hicks was motivated by *justifiable* suspicion.

ed States v. Ortega, 886 F.2d 1062, 1063 (8th Cir.1989) and United States v. Hernandez, 854 F.2d 295, 297 (8th Cir.1988) and United States v. Poitier, 818 F.2d 679, 682 (8th Cir.1987). The first problem with this assertion is that it fails to recognize the development of the case law. All of the cases the majority cites that hold that Agent Hicks-type actions do not constitute a *Terry* stop *predate* the decisions that hold that his actions did constitute a *Terry* stop. This anachronistic approach violates the fundamental principle of stare decisis, namely, that courts should adhere to precedent unless policy concerns require otherwise.

The majority improperly applies language from the *Royer* opinion to conclude that there can never be bright line rules to decide whether a consensual encounter has escalated into a seizure. However, this conclusion is clearly wrong. For example, there can be no question that a consensual encounter escalates into a seizure if a police officer handcuffs the person. Justice White's cautionary language in *Royer* is more properly read to warn reviewing courts not to oversimplify the analysis. *See Royer*, 460 U.S. at 506–07, 103 S.Ct. at 1329. It should not be read to prohibit setting guidelines and standards. The majority also relies on *Michigan v. Chesternut*, 486 U.S. 567, 572–73, 108 S.Ct. 1975, 1978–79, 100 L.Ed.2d 565 (1988), to support its adoption of a contextual, case-by-case approach. However, while recognizing the importance of the context of a police encounter, the *Chesternut* Court also refused to accept the unavoidable arbitrariness inherent in a purely case-by-case approach. The Court stated that its traditional contextual approach to fourth amendment seizure determinations "calls for consistent application from one police encounter to the next, regardless of the particular individual's response to the actions of the police.... [This] allows the police to determine in advance whether the conduct contemplated will implicate the Fourth Amendment." *Chesternut*, 486 U.S. at 574, 108 S.Ct. at 1980. The majority's approach in this case lessens the predictability essential to the fourth amendment and an ordered criminal justice system.

II.

Finally, even though McKines consented to the search of his luggage, the fruits of this search should have been suppressed because the consent was tainted by the fourth amendment violation. During the illegal *Terry* stop, Agent Hicks requested and received McKines' consent to search his luggage. The trial court's finding that McKines' consent was voluntary is not clearly erroneous, and therefore we accept it. However, because the consent was given during an illegal *Terry*-type detention, this court must determine whether the consent was obtained " 'by exploitation of that illegality or instead by means sufficiently distinguishable to be purged from the primary taint [of the preceding illegality].' " *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963) (citing Maguire, Evidence of Guilt 221 (1959)). Because I can see no attenuation between the fourth amendment violation and McKines' consent, I would suppress the evidence found pursuant to the search.

In *Royer*, five Justices held that the defendant's consent to search his luggage did not legitimize the search because it was tainted by his illegal detention. 460 U.S. at 507–08, 103 S.Ct. at 1329; *see also United States v. Delgadillo–Velasquez*, 856 F.2d 1292, 1299–1300 (9th Cir.1988) (consent given almost immediately after illegal arrest not sufficiently attenuated and therefore tainted); *United States v. Miller*, 821 F.2d 546, 549–50 (11th Cir.1987) (evidence obtained through consensual search excluded because taint of illegal stop not sufficiently attenuated to legitimate consent to search); *United States v. Gooding*, 695 F.2d 78, 84 (4th Cir.1982) (voluntary consent to search did not vitiate taint of illegal seizure). *But see United States v. Carson*, 793 F.2d 1141, 1153 (10th Cir.1986) (taint of prior illegal police activity purged when defendant voluntarily consented to subsequent search). The Court noted in *Royer* that had the defendant consented to the search before the illegal detention, the evidence

recovered would have been admissible. 460 U.S. at 505, 103 S.Ct. at 1328. Similarly, had Agent Hicks' encounter with McKines not escalated into a *Terry* stop, then McKines' consent would have been untainted.

When applying fourth amendment taint analysis to consensual searches, courts often look to cases where confessions were obtained after an illegal seizure. *See Royer,* 460 U.S. at 499, 103 S.Ct. at 1325; *Delgadillo–Velasquez,* 856 F.2d at 1299–1300; *Gooding,* 695 F.2d at 84; *United States v. Berry,* 670 F.2d 583, 604–05 (5th Cir. Unit B 1982). In confession cases, the Supreme Court has identified three factors which should be considered in determining whether a confession retains the taint of a prior illegal seizure: " '[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances ... and, particularly, the purpose and flagrancy of the official misconduct.' " *Taylor v. Alabama,* 457 U.S. 687, 691–93, 102 S.Ct. 2664, 2667–68, 73 L.Ed.2d 314 (1982) (quoting *Brown v. Illinois,* 422 U.S. 590, 603–04, 95 S.Ct. 2254, 2261–62, 45 L.Ed.2d 416 (1975)); *see also Dunaway v. New York,* 442 U.S. 200, 217–19, 99 S.Ct. 2248, 2259–60, 60 L.Ed.2d 824 (1979) (close causal connection between illegal seizure and confession, without intervening event, requires confession's exclusion); *United States v. Thompson,* 712 F.2d 1356, 1361–62 (11th Cir.1983) (applying *Taylor* analysis results in exclusion when evidence obtained from consensual search shortly after illegal *Terry* stop).

In this case, McKines consented to the search of his luggage within moments of the illegal *Terry* stop, so there was no temporal attenuation. Furthermore, there

were no intervening circumstances that attenuated the consensual search from the illegal seizure.[4] *See, e.g., Berry,* 670 F.2d at 605 (intervening circumstances include telling accused that she or he may refuse to consent to a search, or consult an attorney). Finally, while the record does not show flagrant or purposeful misconduct on the part of Agent Hicks, that does not provide significant attenuation to purge the taint of the illegal detention.

### III.

Because Agent Hicks' encounter with McKines escalated into a *Terry* stop for which Hicks did not have reasonable suspicion, I would hold that McKines' fourth amendment rights were violated. This violation tainted McKines' subsequent consent to the search of his luggage. Therefore, I would suppress the liquid PCP and reverse McKines' conviction.

LAY, Chief Judge, separately dissenting, with whom McMILLIAN, Circuit Judge, joins.

I concur in Judge Magill's excellent analysis and vote to reverse. I write separately for several reasons. I am bothered by the statement in Judge Beam's opinion that portions of several well reasoned cases of this court should no longer be followed.[1] Each of these cases turned on its own facts and well-reasoned legal evaluations by different panels of the court, adhering to the contextual approach mandated by the Supreme Court. In my judgment, none of these cases were decided erroneously and each should continue as viable precedent in this circuit.

---

**4.** McKines' voluntary consent to the search is not an intervening circumstance that purges the taint of the illegal detention. If McKines did not consent to the search, then there would be no reason to engage in a taint analysis since the search itself would be illegal, unless another fourth amendment warrant exception applied. Instead, consent makes the search independently legal, thus requiring a court to examine the context of the consensual search. However, this is not to say that an illegal detention will always taint a subsequent consensual search.

Rather, a court must determine whether an independently justified search was sufficiently attenuated from the illegal detention so as to purge from it the fourth amendment taint.

**1.** *United States v. Condelee,* 915 F.2d 1206 (8th Cir.1990) (Judge John R. Gibson, Judge Bowman, Judge Magill); *United States v. Millan,* 912 F.2d 1014 (8th Cir.1990) (Judge McMillian, Judge Magill, Judge William Hanson); *United States v. Drinkard,* 900 F.2d 140 (8th Cir.1990) (Judge McMillian, Judge Heaney, Judge Fagg).

Judge Beam's opinion expends a great deal of esoteric discussion on the fairly simple question of what standard governs our review in these cases. In part I of his concurring opinion, Judge Gibson correctly and succinctly answers the question. Whether there is a seizure turns on the totality of the factual circumstances involved, but the ultimate question of whether the facts constitute an arrest or seizure under the Constitution always has been and always will be a question of law for a reviewing court.

Justice Stewart was not espousing new constitutional doctrine when he observed "the correctness of the legal characterization of the facts appearing in the record is a matter for this court to determine." *United States v. Mendenhall*, 446 U.S. 544, 551 n. 5, 100 S.Ct. 1870, 1875 n. 5, 64 L.Ed.2d 497 (1980) (plurality). This was simply a passing legal truism which has been taught to first year law students ever since law schools began. The law is replete with similar examples: whether a finding of fact by a trier of fact in a tort case constitutes negligence is a question of law and requires de novo review; whether factual conduct of a promisee constitutes lawful consideration in a contract case is a question of law. Issues of law and legal conclusions always have been subject to de novo review by appellate courts.[2]

It must be disheartening to McKines, who is facing a life term in prison, to find this court engaged primarily in a confusing legal debate over an issue that is unresponsive to the serious legal contentions raised. This divisive discussion also does not aid the bar or provide clear guidance for the court in the future. This case cries out for a succinct and clear legal analysis.

The fourth amendment, which protects all citizens from unreasonable searches and seizures, is qualified by the necessary aid to law enforcement officers that when offi-cers have probable cause to believe a crime has been or is being committed, a reasonable intrusion into a person's privacy is justified. Beginning with *Terry*, the Supreme Court has instilled more flexibility into police-citizen encounters by approving limited stops on less than probable cause. As society increasingly has become more complex and the problems of crime seemingly have become more intractable, the rationale behind the *Terry* "stop and frisk" rule—that law enforcement must be given more pragmatic leeway to function effectively—has been extended. In order to combat drunk driving, the Court has given states the right to randomly stop motorists for questioning. *Michigan Dep't of State Police v. Sitz*, —— U.S. ——, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990). The Court also has approved mandatory drug testing of employees in select industries. *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). As a final example, the Court has approved "protective searches" of the passenger compartment of automobiles following investigatory stops. *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983).

Nowhere is the pragmatic approach to the fourth amendment embodied in *Terry* more evident than in the fight against illegal drugs. As a nation we recently have embarked on a conspicuous effort to control illegal drug distribution and use, approaching at times almost wartime hysteria similar to that rationalized at the time of the shameful internment of Japanese Americans during World War II. *See Korematsu v. United States*, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944); *see also* Wisotsky, *Crackdown: The Emerging "Drug Exception" to the Bill of Rights*, 38 Hastings L.J. 889 (1987). The result of this policy is repeated episodes of unjustified police searches of the homes and personal

---

**2.** The opinions today attempt to sort out our precedents in terms of the correct legal standard to be used by debating whether a court used the term "find" or "conclude." To me, this is nothing more than semantic tilting at windmills. These are terms that judges use interchangeably in legal discussion. A court may either find or conclude that a district court did or did not err in either its findings of fact or law. In any event, whether or not there is a violation of the fourth amendment turns on the totality of facts involved, but the ultimate question has always been subject to de novo review by an appellate court.

belongings of American citizens. *See, e.g., Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). In addition, the "war on drugs" has resulted in the stopping and searching of individuals based exclusively upon race. *See United States v. Taylor,* 917 F.2d 1402, 1409 (6th Cir.1990); *cf. Buffkins v. City of Omaha, Douglas County, Neb.,* 922 F.2d 465, 470 (8th Cir.1990) (finding reasonable suspicion to stop African–American traveller not established by vague tip that African–American would be arriving from Denver sometime that day).[3] We have no reliable statistical numbers telling us how many innocent people are stopped, questioned, and sometimes searched by law enforcement officers proceeding on little more than intuition. Testimony from drug agents in some airport stop cases, however, shows that only a small percentage of travellers stopped are ever arrested. Cloud, *Search and Seizure by the Numbers: The Drug Courier Profile and Judicial Review of Investigative Formulas,* 65 B.U.L.Rev. 843, 876 & n. 135 (1985). In one case, the district court calculated that the DEA agent involved had arrested only three to five percent of the airport suspects he stopped. *United States v. Moya,* 561 F.Supp. 1, 4 (N.D.Ill. 1981), *aff'd,* 704 F.2d 337 (7th Cir.1983).

As exemplified by the divided opinions here today, the law in this area is in total disarray. In part, this is because there exist no "bright line" rules, and courts are restricted to using "common sense" and "ordinary human experience" instead of rigid criteria. *United States v. Sharpe,* 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1984). *At least for now, all airline passengers are not subject to intrusive stops and searches of their persons and luggage unless officers have articulable reasonable suspicion.* Today, the majority ignores this fundamental principle.[4] When we condone random stops and searches like the one in this case we take one more step toward a police state. It seems to me that the important battle against the scourge of illegal drugs still can be fought effectively if courts require officers to adhere to the *Terry* principles

**3.** In *Taylor,* the police officer testified that seventy-five percent of the individuals followed by the Memphis drug task force are black. 917 F.2d at 1409. The court concluded that "[e]vidently, the agents were more apt to stop Taylor because of his race." *Id.*

**4.** I take additional exception to Judge Beam's and Judge Gibson's interpretation of the Supreme Court's recent discussion and application of the Fourth Amendment, *California v. Hodari D.,* ––– U.S. –––, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). Judge Gibson finds *Hodari D.* supports his belief that no seizure occurred by stating that "[i]f *Hodari D.* was not seized, then I fail to see how a reasonable person could believe, given the circumstances presented by this case, that McKines was not free to leave and thus was seized." *Ante* at 1426.

Judge Beam points out how this interpretation completely misses the mark. He correctly states that *Hodari D.* dealt only with "a 'narrow question' *not present in our case*—whether a person who does not yield to a show of authority is seized." *Ante* at 1415 n. 2 (emphasis added). Contrary to Judge Gibson's suggestion, whether a reasonable person would not feel free to leave and whether the suspect submitted to an officer's show of authority are separate questions. What Judge Beam does not acknowledge, is that McKines did yield and did submit to the officers' "show of authority." This oc-

curred at the time of the "consensual questioning" that led to McKines' removal to a small room or alcove off of the terminal concourse *Cf. Florida v. Royer,* 460 U.S. 491, 504–05, 103 S.Ct. 1319, 1328, 75 L.Ed.2d 229 (1983) (plurality). Unlike the suspect in *Hodari D.,* McKines did not attempt to flee when the officers approached, but instead submitted to their questioning.

Before moving McKines to a small alcove, Agent Hicks told McKines that he was a DEA agent and requested McKines' airline ticket and his driver's license. Hicks stated he was looking for drugs. He then asked to look in McKines' suitcase. At the time of the initial search Detective Kessler stood in the three foot entry-way of the alcove, two and one-half feet away from Agent Hicks. Although the government urges that McKines gave his consent to a search of his luggage, the record makes clear this "consent" was nothing more than mere acquiescence and submission to the officers' show of authority. It defies human experience to assume under the existing circumstances that the officers did not convey a message of intimidation that would lead a reasonable person to conclude he was not free to go. Thus, the "necessary" condition under *Mendenhall* had been established. Rather than fleeing, McKines submitted to the show of authority and the seizure occurred. The Fourth Amendment was clearly implicated and without reasonable articulable suspicion the seizure was illegal.

before targeting and questioning presumably innocent travellers. Random invasions of an individual's privacy cannot be justified by the necessity of extinguishing illegal drug use. Courts remain a bulwark against the erosion of civil liberties brought on by the war on drugs. We should not shrink from our duty by hiding behind disingenuous concepts such as "consensual" seizures. Nor should we engage in obfuscating debate about what standard of review governs these cases.